ROXANNE JACKSON,       CIVIL NO.  12-641 (PJS/JSM)

   Plaintiff,

v.            <u>REPORT AND RECOMMENDATION</u>

MICHAEL J. ASTRUE,
Commissioner of Social Security,

   Defendant.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 8] and defendant's Motion for Summary Judgment [Docket No. 15].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).  Plaintiff is proceeding <u>pro se</u>; defendant is represented by David W. Fuller, Assistant United States Attorney.

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment be **DENIED** and that defendant's Motion for Summary Judgment be **GRANTED**.

## I.  PROCEDURAL BACKGROUND

Plaintiff Roxanne Jackson ("Jackson") filed her applications for disability insurance benefits on July 18, 2007, alleging a disability that began on May 31, 2000 through the last date insured, December 31, 2005, due to degenerative disc disease and abdominal problems.  Tr. 19, 156-64, 217.  Jackson's applications were denied initially and upon reconsideration.  Tr. 52-55.  At Jackson's request, an administrative hearing was held on September 17, 2008, before Administrative Law Judge George Gaffaney.  Tr. 82-83, 59.  The administrative law judge issued a decision finding that

Jackson was not disabled. Tr. 56-67. The Appeals Council granted Jackson's request for review and remanded the case to another administrative law judge for further proceedings. Tr. 68-71.

On August 16, 2010, another hearing was held before Administrative Law Larry Meuwissen ("ALJ"). Tr. 19, 36. Testimony was taken at the hearing from a vocational expert ("VE"), Nassbaum, and from Jackson. Tr. 36. The ALJ issued a decision on August 24, 2010, finding that Jackson was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 16-28. Jackson filed a request for review of the ALJ's decision with the Appeals Council, the Appeals Council denied Jackson's request for review and upheld the ALJ's decision denying disability insurance benefits to Jackson, (Tr. 1-5), making the ALJ's findings the final decision of defendant. See 42 U.S.C. § 405(g).

Jackson has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [Docket No. 1]. The parties now appear before the Court on cross motions for summary judgment [Docket Nos. 8, 15].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a). The Social Security Administration ("SSA") shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. § 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are

other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

### B.    **Appeals Council Review**

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.    **Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.  The credibility findings made by the ALJ;

2.  The plaintiff's vocational factors;

3.  The medical evidence from treating and consulting physicians;

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5.  Any corroboration by third parties of plaintiff's impairments;

6.  The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v.

Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.  DECISION UNDER REVIEW

The ALJ concluded that Jackson was not entitled to disability insurance benefits under §§ 216(i) and 223(d) of the Social Security Act, and that she was not entitled to supplemental security income under § 1614(a)(3)(A) of the Social Security Act. Tr. 28. In reaching this determination and applying the five-step process, the ALJ made the following findings:

> 1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2005.
>
> 2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of May

6

31, 2000 through her date last insured of December 31, 2005 (20 CFR 404.1571 et seq.).

3.      Through the date last insured, the claimant had the following severe impairment: degenerative disc disease of the cervical spine and abdominal pain with pelvic adhesions and bowel dysfunction (20 CFR 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The severity of claimant's physical impairments does not meet or equal a listed impairment. There are no medical findings that would support a listing level impairment.

5.      Through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lifting no more than 10-15 pounds and moving around better than stationary with no restrictions on walking or standing.

6.      Through the date last insured, the claimant was capable of performing past relevant work as a check sorter. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant was not under a disability, as defined in the Social Security Act, at any time from May 31,2000, the alleged onset date, through December 31, 2005, the date last insured (20 CFR 404.1520(t)).

Tr. 21-28.

At step four of the five-step process, the ALJ concluded that while Jackson was somewhat limited by her physical impairments, she was not precluded from engaging in competitive employment consistent with the RFC he had assigned to her. Tr. 23. In determining Jackson's RFC, the ALJ evaluated Jackson's subjective complaints as she described them at the hearing. Tr. 23. The ALJ indicated that Jackson had testified

that she could not work because of problems to her neck and shoulder that began after a car accident in 1998, which is why she left her job as a check processor. Id. Jackson admitted that on some days she could function without pain, but that the pain would always return a day or two later. Id. Jackson stated that the surgery on her right shoulder helped with her shoulder range of motion but not her neck, and that she had not had surgery on her neck. Id. Jackson testified that at times she had spasms and swelling in her right arm; in 2002, she used a hot shower or bath for her symptoms and then would go back to bed; she was currently using a TENS Unit[1] once every 1-2 weeks but uses a Whirlpool more often; and she took a variety of medications for her pain, abdominal and bowel problems. Id. Jackson reported no problem with standing or walking, but standing is better than walking; sitting made her sore and she had to move a lot. Id. Jackson stated she did not perform many household chores and she felt she could lift 15 pounds. Id.

According to the ALJ, the medical records failed to show the type of significant clinical and laboratory abnormalities one would expect to find if Jackson were disabled. Id. With regard to her abdominal pain, the ALJ found that a barium enema performed on Jackson in October 2001 and sigmoidoscopy performed in October 2002 were normal (citing to Tr. 294); a CT scan taken on December 2002, of the abdomen and pelvis was normal with just small lesions or cysts (citing to Tr. 384); a MRI dated May 13, 2005 of the pelvic floor was normal except for a mild thickening of a muscle and no focal findings were present to explain persistent pelvic pain (citing to Tr. 435); and on June 23, 2002, Dr. Asim Khan noted only that her abdomen was soft (citing to Tr. 370).

---

[1]     TENS refers to "transcutaneous electrical nerve stimulation."

In addition, the ALJ concluded that treatment for Jackson's abdominal pain was conservative, based on Dr. Jacqueline Olczak's statement that Jackson just needed to persevere through the pain (citing to Tr. 347); following Botox treatment to her pelvic floor on June 28, 2004, she reported improvement to Dr. Olczak (citing to Tr. 349); Dr. Olczak noted on January 22, 2003 that Jackson refused to take medication prescribed to her (citing to Tr. 361); and Jackson refused to pursue biofeedback and physical therapy prescribed to her by Dr. Laura Goetz on July 16, 2008 (citing to Tr. 521). Id. The ALJ also noted that Jackson had been seen by the Mayo Clinic in March 2003, where she was prescribed a management program which included bowel conditioning, reduction in narcotic use and a chronic pain management strategy. Id. (citing Tr. 778-93) Further, despite Jackson' complaints of constipation and bowel discomfort, Dr. Jennifer Auge[2] stated on December 2, 2008, that she was inconsistently treating her bowel issues and her use of numerous health care providers adversely affected her continuity of care. Tr. 23-24 (citing Tr. 683).

As to her neck pain, the ALJ found that Jackson's subjective complaints did not correlate to the objective findings in the medical record. Tr. 24. In support, the ALJ relied on Dr. Khan's June 2002 progress note, where Dr. Khan had indicated that Jackson had good grip in her hands; a good range of motion her fingers, wrists, elbow joint and shoulder joints, and while he noted discomfort noted in her neck, there was no evidence of pain radiating to her arms or tenderness in her thoracic spine. Id. (citing Tr. 370). At an examination by Dr. Eric Schenk on October 27, 2004, there was no evidence of atrophy; she showed strength bilaterally and had adequate sensation; and

---

[2] The ALJ identified Dr. Auge as the medical provider who generated this comment. However, the medical provider was Dr. Savanna Borne. Tr. 683.

he found there was no dynamic instability of her spine noted in the x-rays. Id. (citing Tr. 399). Further, the ALJ indicated that there were only mild findings noted on the MRI of the spine conducted in November 2007 (Tr. 464) and that when she was seen by Dr. Kevin Mullaney on May 27, 2009, she denied any radicular pain. Id. (citing Tr. 727).

The ALJ also cited to and gave great weight to the physical work performance evaluation performed on Jackson by Ergo Science on March 19, 2007, and the September 18, 2007 independent examination by Dr. Thomas Jetzer. Id. (citing Tr. 554-64, 881-91). The ALJ noted that the evaluation completed at Ergo Science indicated that Jackson could frequently sit, stand, and walk; frequently reach from desk level and below the waist, with continuous fine manipulation bilaterally, and continuous simple and firm grasping bilaterally; she could lift 10 pounds occasionally, carry 12 pounds occasionally, push 19 pounds occasionally, and occasionally pull 16 pounds; and frequently climb stairs, kneel, crouch and crawl, but only occasionally stoop. Id. According to the ALJ, this opinion was based on an extensive functional examination of Jackson. Id.

As to the evaluation performed by Dr. Jetzer, the ALJ stated that Dr. Jetzer identified only mild limitations for Jackson. Id. On examination, Jackson had involuntary turned of her neck to 60 degrees and was nearly able to touch her chin to her chest when asked, her shoulder examination was normal, she had good grip strength bilaterally, no spinal pain or spasm were identified, her walk was normal, and she had a normal bowel. Id. The ALJ indicated that Dr. Jetzer had concluded that Jackson's complaints were not supported by the physical examination findings, and that Jackson was capable of sedentary or even light full time work. Id.

The ALJ found that the treatment received by Jackson for her neck pain was conservative and routine, noting that Dr. Khan in June 2002, prescribed medication and massage, and Drs. Khan, Ensor Transfeldt and Garry Banks recommended against surgery. Tr. 25 (citing Tr. 335-91). Additionally, at her appointment on September 26, 2003 with physical therapist Jay Tracy, Jackson reported that physical therapy helped her a lot; at her appointment with Dr. Steven Sabers on November 21, 2002, she reported that facet join injections at the cervical level improved her symptoms (Tr. 876); and she reported to Dr. A Nadine Maurer on November 15, 2007, that pain aggravated by bending, crouching, housework, stress, tension and twisting, were improved with heat, changing positions, medication and rest. Tr. 25 (citing Tr. 463). The ALJ also noted that Jackson's claims of aggravating symptoms were not consistent with her reports that she was able to care for grandson, wash laundry and cook. Id.

The ALJ then analyzed the opinions in the record by the various providers seen by Jackson. Id. Dr. Dennis Callahan indicated on February 12, 2002, that he thought Jackson was exaggerating her symptoms; the vocational person at Sister Kenney, noted that she felt Jackson could work, but Jackson disagreed; and while Dr. Olczak believed that Jackson had a chronic pain problem, he also felt that she would not accept this diagnosis which adversely affected her treatment. Id. (citing Tr. 335-91). The ALJ rejected the statements by Drs. Olczak, James Presthus, Transfeldt and Maurer that Jackson could not work due to neck and pelvic pain and limitations on sitting or standing, because these statements were inconsistent with the objective medical record showing sporadic reports of pain, conservative findings, denial of radicular symptoms, improvement with treatment, and Jackson's own testimony that her ability to stand and

11

walk were not affected. Id. (citing Tr. 332-36, 394-440, 715-77). In addition, the ALJ gave no weight to Dr. Matthew Monsein's opinion on November 7, 2003, that Jackson could not work, stating it conflicted with Dr. Monsein's opinion dated April 28, 2004, that she could perform sedentary work, and Dr. Monsein's opinion he would support the idea of Jackson obtaining some employment unless she had clear chronic problems. Id. (citing Tr. 317, 319, 322). The ALJ also rejected Dr. Monsein's statement in April 28, 2004, that Jackson needed sedentary work, because it conflicted with the records showing improvement in symptoms, which is supported by objective medical findings when she was pushed by staff to participate in treatment. Id.

The ALJ gave great weight to the RFC assessment performed on November 2, 2000, by physical therapist Sharon Olson at the Institute for Occupational Rehabilitation because her conclusions – that Jackson could work 4-5 hours a day – was consistent with the overall medical record and supported the findings of his decision that Jackson could perform her past relevant work. Tr. 26 (citing Tr. 538-53, 565-80).

With respect to Jackson's description of her daily activities, which included cooking one meal a day, daily laundry washing, and caring for her grandson, the ALJ determined they were not limited to the extent one of have expected given her complaints of disabling symptoms and limitation. Id.

Ultimately, the ALJ concluded that while Jackson's impairments could cause her alleged symptoms, her claims as to intensity and persistence of the symptoms were not credible to the extent not consistent with the RFC. Id.

As for the opinions of the state agency physicians, who recommended a medium exertional level with limits on postural activities and exposure to hazards (citing Tr. 448-

55), the ALJ did not incorporate such limits into the RFC because of improvement of previously conservative findings (citing Tr. 290-97, 337-91, 394-440), but he did reduce the RFC to light work based on her subjective complaints of pain. Id.

At step five of the evaluation, the ALJ considered the opinion of the VE that Jackson's past employment as a check sorter was sedentary in nature, and based on this opinion, the ALJ found that Jackson could perform her job as actually performed. Id. In addition, based on the VE's opinion, the ALJ concluded that Jackson could perform other light jobs only requiring lifting up to 15 pounds, including a file clerk, check cashier and general clerk. Tr. 27.

## IV. THE RECORD

Jackson was 53 years old at the time of the hearing and the ALJ's decision. Tr. 36, 40. Her is past employment was an operations clerk at the Federal Reserve Bank from 1985 until 2000. Tr. 218, 225.

### A. Medical Records[3]

Between October 24, 2000 and November 2, 2000, Jackson had a functional examination and assessment performed by physical therapist Sharon Olson of the Institute for Occupational Rehabilitation. Tr. 551. The assessment indicated that

---

[3]   Jackson submitted several additional documents to the Court with her brief on the merits. See Affidavit of Plaintiff [Docket No. 9] ("Pl.'s Aff."). Exhibits A (Tr. 538-39, 551-53), E (Tr. 331), F (Tr. 407-09) and G (Tr. 467), were already part of the transcript. Exhibit B is an email for Sallie Lundy-Frommer dated November 13, 2000, stating that an unidentified medical board had extended Jackson's long-term disability.  This document was submitted to the Appeals Council and can be found in the transcript (Tr. 9), along with a job description from Jackson's previous position. Tr. 11-13. Exhibit C is a functional capacities check list form filled out by licensed psychologist Jay Tracy and Dr. Monsein on June 24, 2003.  Exhibit D is a May 11, 2004 letter to Cigna from Dr. Olczak.  Exhibit H was the decision of ALJ George Gaffney, which appears in the record. Tr. 56-67.

Jackson's position as an operating clerk was performed 6 hours per day and three days per week. Tr. 552. Based on her evaluation, Olson concluded that Jackson could return to work after first completing the pain management program, starting first at four hours per day, three days per week with restrictions outlined in the Functional Assessment Overview. Id. The Functional Assessment Overview stated that Jackson could work a maximum of 5 hours per work day with the ability to sit for 4-5 hours, stand 3-4 hours and walk occasional short distances over a period of 2-3 hours. Tr. 538. In addition, the Assessment recommended Jackson's neck remain in a neutral spine position for most of her work, with neck flexion activities limited to a minimally occasional basis, neck rotations limited to an occasional basis, reaching away from her body with her right upper extremity limited to a minimally occasional basis, and use of the keyboard limited to an occasional basis initially (e.g., 20 minutes per hour) and then increased gradually. Tr. 552-53. With respect to weight restrictions, Olson indicated Jackson could lift 10.4 pounds bilaterally above her head, 12.6 pounds bilaterally from floor to chair or chair to floor, carry a maximum of 8.6 pounds in her left hand and 4.2 pounds in her right hand, and could push or pull 15.5 pounds with her left hand and 8.9 bilaterally. Tr. 539.

On November 13, 2000, an email was sent by Sallie Lundy-Frommer regarding Jackson that stated, "[p]lease be advised that the Medical Board has approved the continuation of the Long-Term Disability claim for Ms. Jackson." Tr. 10. The email attached a checklist dated December 3, 1999, setting forth the essential functions for the job of Operations Clerk III. Tr. 11-12.

On January 9, 2002, Jackson saw Dr. Olczak.  Tr. 378.  Dr. Olczak noted that Jackson went through the Sister Kenny pain program,[4] and it was recommended that Jackson have a MRI recheck of her neck because she continued to have pain, was developing shoulder pain and shoulder mobility issues.  Id.  Jackson was also having problems with her bowels.  Id.  Jackson had been taking Milk of Magnesia, fiber and Senokot for her constipation.  Id.  Jackson was also taking Ultracet and a muscle relaxant, which made her pain tolerable, but did not completely eliminate it.  Id.  Jackson had limited range of her shoulder during the examination, but Dr. Olczak was not sure if Jackson was just resisting her.  Id.  Jackson's shoulder especially hurt during extension and Dr. Olczak could not fully abduct or flex the shoulder.  Id.  The pain appeared to be muscular in nature.  Id.  The x-ray of Jackson's shoulder appeared normal.  Id.  Dr. Olczak indicated that a repeat MRI of Jackson's shoulder performed.  Id.

A cervical MRI dated January 10, 2002, showed moderate multilevel cervical degenerative disc disease, a small to moderate central disc bulge and a moderate disc complex, but there was "no change since prior exam to explain new symptoms."  Tr. 387.

On February 4, 2002, Jackson presented to Dr. Banks, with neck and upper extremity pain.  Tr. 288.  Johnson reported that this pain had started in 1998 after an automobile accident and her symptoms had become worse since May 2000.  Id.  The pain in her arm went to her hand, without any numbness.  Id.  The neck pain was described as consistent and the arm pain was characterized as "shooting," with pain worsening with movement.  Id.  Upon examination, Dr. Banks found that Jackson's gait

---

4  No records were supplied bearing on Jackson's attendance at this program.

was normal, she had some right C6-7 facet area tenderness, severe restriction of her neck on all planes, and tenderness in her right shoulder.  Tr. 289.  Jackson claimed that she could not lift her arm above 90 degrees since October 2001.  Id.  Dr. Banks noted that the January 10, 2002 cervical MRI showed moderate multilevel cervical degenerative disc disease ("DDD") and a small central disc herniation with no neural impingement.  Id.  Dr. Bank's diagnoses was multi-level cervical DDD and right shoulder pain.  Id.  Dr. Banks advised Jackson that surgery was not an option; the pain would improve with time; she should maintain a home neck exercise program on her own; she should be aware of her body mechanics and avoid lifting objects over her head; and injections in her back would only give her short term relief.  Id.  Dr. Banks' main concern was Jackson's limited movement in her shoulder and recommended that she have an MRI performed on that area.  Id.

An MRI of Jackson's right shoulder dated February 7, 2002, showed no evidence of tears or fractures.  Tr. 389.  A small amount of fluid was observed, which was a non-specific finding, but could be seen with bursitis.  Id.

On February 12, 2002, Jackson had a consultation with Dr. Callahan regarding pain in her right shoulder.  Tr. 375, 377.  Dr. Callahan was unable to test Jackson's strength in her right shoulder because she was unwilling or unable to resist internal or external rotation of the shoulder.  Id.  Jackson claimed more pain with external rotation, as opposed to internal rotation.  Id.  However, she would not even show any exertion with her left shoulder.  On the right side, she complained of pain with palpitation and she was unwilling to let Dr. Callahan move the arm around in any fashion.  Id.  Dr. Callahan felt that this was the product of excessive guarding, as opposed to a frozen shoulder.

Id. Dr. Callahan opined that Jackson's problems with her right shoulder were more than an impinged shoulder and more consistent with someone whose problems were brought on by emotional problems or someone who is trying to exaggerate her symptoms. Id. The fact that Jackson could not flex her elbow when attempting reach behind her back, when she could bend her elbow in front of her, was highly suspicious. Id. Dr. Callahan was cautious about that fact that Jackson would show excessive pain following a simple shoulder examination and showed palpable pain over many areas around her shoulder. Id. Dr. Callahan noted that Jackson's MRI was not very remarkable given the symptoms Jackson claimed to be experiencing. Id. Dr. Callahan believed that Jackson was a chronic pain patient. Id.

In a note dated February 13, 2002, Dr. Callahan indicated that he had spoken with Dr. Olczak regarding his findings as to Jackson. Tr. 376. Dr. Callahan told Dr. Olczak that he believed that Jackson had chronic pain syndrome, that she was unwilling to accept it and was looking for other explanations. Id. Dr. Callahan opposed any surgical intervention. Id. Dr. Callahan also stated that Jackson needed to accept that her chronic pain syndrome was not going to go away with surgical intervention or medication. Id. Dr. Olczak agreed with this opinion, noted that providers at Sister Kinney felt as though the patient had not responded to treatment as expected, and that Jackson was resistant to the idea of accepting a diagnosis of chronic pain syndrome. Id.

On February 25, 2002, Jackson saw Dr. Olczak for a follow-up for chronic neck and shoulder pain, which Dr. Olczak believed was myofascial and a chronic pain syndrome. Tr. 374. Dr. Olczak noted that Jackson had finally come to grips with the

fact that was nothing that could be done for her pain.  Id.  Jackson had been seen at the Sister Kenny pain clinic and by two other doctors who both felt that nothing surgical could be done for Jackson.  Id.  Jackson had been using Ultracet and Norflex with minimal pain relief, but she did not want use narcotics.  Id.  Jackson expressed that her major concern was the vocational person at Sister Kenny had stated that she was able to work to some extent, when Jackson felt that she could not work at all.  Id.  Dr. Olczak encouraged Jackson to see a psychologist.  Id.

On April 3, 2002, Jackson saw Dr. Monsein, for a follow-up related to right neck and shoulder pain.  Tr. 303.  Jackson was frustrated that she had not gotten any better, and was concerned that she might have some structural defect causing her pain.  Id.  Dr. Monsein noted that a MRI of cervical region showed nothing remarkable, but that Dr. Banks had previously indicated that Jackson had marked restrictions in terms of her right shoulder, with evidence of multilevel cervical DDD and a small disc herniation at C5-7.  Id.  During the examination, Dr. Monsein found that Jackson had diffuse tenderness to palpitation over the paraspinal muscle in the neck and shoulder region, she appeared to be developing a frozen shoulder with minimal movement of the shoulder within the capsule, and she exhibited moderate to severe restriction as to rotation and flexion limited to 80 degrees.  Id.  Jackson's neurological examination was benign and she had normal reflexes and no gross sensory defects.  Id.  Dr. Monsein's impression was multilevel degenerative cervical DDD, right shoulder pain, frozen shoulder, and chronic pain syndrome.  Id.  While Dr. Monsein thought that Jackson may be a candidate for more aggressive physical therapy or manipulation, he suggested that Jackson undergo acupuncture to get her shoulder moving again.  Id.  Dr. Monsein noted

that Jackson had not returned to work, was on long-term disability and that it did not appear that she would be able to return back to her previous line of work. Tr. 304. Jackson told Dr. Monsein that she was convinced that there was nothing she could do on a full-time basis. Id. Dr. Monsein indicated this "may well be the case," but he wanted to be more aggressive with rehabilitation. Id. Dr. Monsein also noted that while there was a significant unspecified functional limitations in the range of motion of her right shoulder, from a cognitive standpoint her brain worked well, and all he could do was outline her functional limitations on her "ability to use her right upper extremity on a sustained basis." Id.

On April 5, 2002, Jackson was seen by Dr. Hany Yacoub for her chronic pain problems. Tr. 373. Jackson complained of upper neck and shoulder pain and sacroiliac joint pain, hip pain and an irritable bowel. Id. Jackson had been going to a pain clinic and had taken Celexa. Jackson continued to have problems with constipation, but she had a normal barium enema. Id. Another doctor had provided her with a prescription Donnatal for her colon pain, which initially helped, but not anymore. Id. An evaluation from another physician as to her shoulder pain suggested that might be some exaggeration of Jackson's symptoms. Id. The MRIs for Jackson were unremarkable for her symptoms. Jackson was taking Ultracet and muscle relaxants. Id. Jackson exhibited diffuse abdomen discomfort and she was tender over the sacroiliac joint. Id. Jackson's hip flexion and extension were normal, her knees were fine and her sensation to her lower extremities were intact. Id. Dr. Yacoub's impression was that Jackson was suffering chronic pain syndrome, had a history of irritable bowel syndrome, and had chronic right shoulder pain. Id. Dr. Yacoub prescribed Doxepin at bedtime for her

irritable bowel and also had her start on Neurontin.  Dr. Yacoub also suggested physical therapy, but Jackson did not want to undergo physical therapy because she had already tried it and it did not work.  Id.

On April 24, 2002, Jackson saw Dr. Olczak for a follow-up or her chronic pain and irritable bowel.  Tr. 372.  Jackson had constant back pain, which was attributed to her irritable bowel syndrome.  Id.  Dr. Olczak could push on Jackson's back to reproduce the pain and therefore thought the pain may be due to nerve irritation.  Id.  Jackson had been started on Doxepin, which helped her constipation, but did nothing for the pain.  Id.  Jackson was taking Ultracet two to three times a day and Dr. Olczak increased that amount up to four times a day.  The plan for Jackson was to continue with acupuncture and seeing another doctor for her irritable bowel.  Id.

On May 31, 2002, Jackson presented to Dr. Olczak for pain to the lower back that was initially thought to be attributable to her irritable bowel but now was thought to be attributable with a myofasical pain.  Tr. 371.  The back pain was bearable with prescriptions.  Id.  Jackson exhibited tenderness in her back so Dr. Olczak wanted to see if a trigger point injection would offer Jackson any benefit.  Id.

On June 3, 2002, Jackson was seen by Dr. Khan regarding her chronic pain.  Tr. 369.  Jackson noted that her lower back pain had gotten worse, but that her tail bone pain had resolved and that pain from her constipation as a cause of her lower back pain had "more or less resolved."  Id.  Jackson complained of continued fatigue and pain all over her body, muscle spasms, back pain radiating into her legs intermediately, muscle weakness, tingling, tenderness and swelling in her arms, neck and hip area.  Id.  She denied sensitivity or pain in her hands.  Id.  The examination of Jackson showed good

grip in her hands; good range of motion in her wrists, elbows and shoulders; hip joints were tender during rotation; knee joints were normal; she had slightly tender ankles; rotation, flexion and extension of the cervical spine caused discomfort, but with no pain radiating into the arms; there was no tenderness of the thoracic spine; Jackson demonstrated a great deal of tenderness in the left sacroiliac joint area; and she had tender spots consistent with a fibromyalgia like presentation.  Tr. 370.  Dr. Khan's impression was that plaintiff had a history of myofasical pain syndrome, fibromyalgia and sacroiliitis-like presentation.  Id.  Dr. Khan gave Jackson an injection of Medrol and lidocaine to her sacroiliac joint and believed that she would benefit from deep tissue massage.  Id.

On June 26, 2002, Jackson saw Dr. Olczak for a follow-up related to her pain.  Tr. 368.  Dr. Olczak noted that an injection in Jackson's sacroiliac joint did not provide any improvement in lower back pain.  Id.  Dr. Olczak was going to have Jackson try myofacial massage therapy to alleviate Jackson's pain, since other options had not worked.  Id.  Jackson reported that the acupuncture she had been receiving provided some relief to her neck pain, but that she generally was just struggling along.  Id.  Jackson also indicated that her bowels were moving well and was not having any problems with constipation.  Id.  Jackson believed that her lower back problem was being caused by something pushing on her lower back muscles.  Dr. Olczak was not sure what was causing Jackson's problems.  Id.  Dr. Olczak increased the number of Neurontin she was taking from one to three a day.  Id.  Dr. Olczak noted that Jackson was coping.  Id.

On July 12, 2002, Jackson again saw Dr. Monsein regarding her neck, right shoulder and right arm pain. Tr. 305. Dr. Monsein noted an improvement with her frozen right shoulder as a result of acupuncture. Id. Jackson stated that the acupuncture was very helpful in loosening up her neck and shoulder region, but she continued to be symptomatic. Id. Jackson rated her pain with medications as five out of ten. Id. While she was still experiencing tightness in the cervical muscles, there was not as much tension as previously observed. Id. Dr. Monsein stated Jackson's shoulder was "actually much better" and she was able to elevate her arm 120 degrees, but there was still limitation in shoulder abduction and rotation. Id. Jackson continued to have tenderness across the paracervical region with a decreased range of motion of the cervical spine. Id. Dr. Monsein observed no gross motor or sensory defects. Id. Dr. Monsein's impression was multilevel cervical DDD, right shoulder pain, frozen shoulder, and chronic pain syndrome. Id. Dr. Monsein believed Jackson was getting better, but that she still experienced significant pain. Tr. 306. Dr. Monsein did not have many more options for Jackson considering she had gone through physical therapy, a pain rehabilitation program, trigger point injections and she was not a surgical candidate. Id. Jackson was to continue taking her pain medications, attempt traction as a part of physical therapy, and try some self-message. Id.

On August 15, 2002, Jackson saw Dr. Olczak for pain in the lower back and hip area that Jackson believed was due to her bowels. Tr. 367. Jackson was taking Ultracet and Neurontin for pain, which was not helping. Id. Jackson indicated that her neck had been feeling relatively good and that her tail bone did not bother her. Id. Jackson did not have the classic signs of irritable bowel syndrome and her focus was on

her lower back pain.  Id.  Dr. Olczak noted that the cause of the back pain had not been found.  Id.  There was no obstruction of her bowel or obvious mass lesion.  Id.  Jackson believed something was inflamed, so Dr. Olczak thought about trying Vioxx as an anti-inflammatory, which would also help with any musculoskeletal pain that she was experiencing.  Id.  Jackson was comfortable with this treatment route.  Id.  Jackson believed exploratory surgery was the answer, however, Dr. Olczak did not believe that any surgeon would be too eager to go that route.  Id.  Dr. Olczak thought Jackson could undergo another colonoscopy.  Films of Jackson's bowel and hip on August 15, 2002 did not indicate that her bowel was distended in manner that would indicated an obstruction and while her hip films showed a small spur on the right femoral head, there was no acute bony abnormality that would account for Jackson's left hip pain.  Tr. 388.

On September 23, 2002, Jackson saw Dr. Olczak for a follow-up regarding her chronic pain.  Tr. 365.  Nothing had changed for Jackson.  Id.  Jackson tried physical therapy on the neck, but it only aggravated the condition.  Id.  All interventions and investigations had not alleviated Jackson's pain and she was not a surgical candidate. Id.  Jackson was going to see a gastroenterologist for her irritable bowel.  Id.  Dr. Olczak stated that Jackson was a difficult patient in that Dr. Olczak believed Jackson was going to end up with chronic pain and chronic irritable bowel.  Id.  Jackson had not responded to any therapeutic intervention and medications of Ultracet, Neurontin and Deoxepin had remained stable.  Id.  According to Dr. Olczak, Jackson never requested narcotics for her pain.  Id.

On September 27, 2002, Jackson was seen by Dr. Neville Basman related to right upper quadrant abdominal tenderness and left hip pain and irritable bowel

23

syndrome.  Tr. 296.  Jackson complained of alternating constipation and diarrhea with rectal bleeding occurring several months earlier.  Id.  Jackson's general exam was normal, she did have tenderness in her neck and back and her abdomen was benign.  Id.  Dr. Basman's impression was irritable bowel and chronic pain syndrome and he doubted any organic gastrointestinal problem.  Id.  Inflammatory disease was unlikely and her mild rectal bleeding was undoubtedly hemorrhoids.  Id.  Dr. Basman felt that Jackson did warrant a flexible sigmoidoscopy.  Id.

On October 16, 2002, Jackson was seen by nurse practitioner Gina Storrs for her irritable bowel syndrome, left hip and buttock pain that became worse with walking.  Tr. 294.  Jackson denied any significant lower abdominal pain or discomfort, she had been having regular bowel movements and that she had not been recently seeing any variability in her bowel movement.  Id.  Jackson was on multiple pain medications for chronic pain syndrome, but none of these medications relieved the discomfort in her hip or buttocks.  Id.  Jackson had undergone a flexible sigmoidoscopy, which was normal except for one hyperplastic polyp.  Tr. 292-94.  Storrs indicated that Jackson was not in any acute distress during the examination with Storrs, she exhibited palpable tenderness in the left buttocks, and she moved her left leg slowly when getting onto the examination table.  Tr. 294-95.  Storr did not believe that Jackson's left hip and buttock pain were the result of her irritable bowel syndrome and suspected that she may have sciatica[5] or some other neuromuscular problem.  Tr. 295.

---

[5]     Sciatica: "Pain of the lower back and hip radiating down the back of the thigh into the leg. . . ."  Stedman's Medical Dictionary (27th ed. 2000).

On October 23, 2002, Jackson reported to physical therapist Jay Tracy at the Sister Kenney Institute that she cooked one meal a day, did laundry daily, and enjoyed taking care of her grandson.  Tr. 307.

On November 4, 2002, Jackson consulted with Dr. Sabers for an evaluation of her neck, shoulder and left hip pain.  Tr. 872.  Jackson appeared to be in mild distress, her gait was normal, gross motor skills were normal, her strength was normal other than slightly limited in the upper extremities due to pain, her cervical spine motion was markedly limited in all planes with discomfort in the lower back and limited flexion and extension, joint range of motion was unremarkable except for significant limitation of the right shoulder, and there was pain with palpitation of the cervical and left lumbosacral region.  Tr. 873.  Dr. Saber's impression of Jackson was chronic neck and shoulder discomfort, evidence of rotator cuff dysfunction and shoulder pain, MRI documented degeneration at C5-6 and C6-7, and left lumbosacral pain.  Id.  It was decided that Jackson would receive an anesthetic and steroid injection in the cervical spine region, which she received on November 7, 2002.  Tr. 873, 875.

On November 6, 2002, Jackson had a MRI of her hip that was negative for any findings that that could be attributed to Jackson's hip pain.  Tr. 386.

On November 21, 2002, Jackson saw Dr. Sabers with the complaint of a sudden onset of left-sided neck, shoulder and arm pain, with numbness that began that morning.  Tr. 876.  The pain was constant and was exacerbated by movement in her left arm.  Id.  Jackson denied any left arm weakness or incontinence.  Id.  When asked about a recent facet point injection, Jackson stated she was starting feel better prior to her present relapse.  Id.  Her medications included Ultracet, two Neurontin and Norflex,

none of which decreased her pain level adequately.  Id.  There was severe tenderness of the paraspinal musculature on the left side and tenderness with palpitation along the scapular border.  Id.  A neurological examination showed 50% decrease to touch.  Id.  There was a decreased range of motion of the upper extremities.  Id.  Jackson was started on Indocin SR and was given a small number of Vicodin for pain relief.  Id.

On November 25, 2002, Jackson saw Dr. Sabers for the same flare-up. Tr. 878. Dr. Sabers believed that Jackson's pain was the result of a muscle spasm.  Id.  Jackson noted that her pain had started to return to baseline.  Id.

On December 2, 2002, Jackson saw Dr. Monsein regarding her neck and right shoulder pain.  Tr. 309.  Jackson reported an increase in neck pain over the previous months.  Id.  Jackson had received a facet injection into her neck with no improvement. Id.  Jackson had gone to the emergency room several days earlier and was given a shot of morphine.  Id.  Jackson reported that her pain was overwhelming and prevented her from doing any activity level.  Id.  She was taking two Vicodin, Percocet and Valium.  Id. Jackson rated her pain 8-9 of a scale of 1-10, but denied any radicular symptoms.  Id. Dr. Monsein's examination showed that Jackson had tenderness over the cervical, paracervical and scapular border.  Id.  Jackson had a decreased range of motion of her cervical spine in all directions, flexion was down about 50%, extension was down 60% and lateral motion was about 50%.  Id.  Dr. Monsein noted that there was no muscle weakness.   A previous MRI on January 10, 2002 showed multilevel degenerative cervical DDD particularly at the C5-6 and C6-7, but nothing was indicated that would account for Jackson's new symptoms.  Tr. 309, 387.  Dr. Monsein discussed surgical options with Jackson, but had exhausted most conservative methods at pain control.

Tr. 310.  Dr. Monsein believed that most of her pain was myofascial and mechanical in nature and that depression might be a contributing factor.  Id.

On December 4, 2002, Jackson saw Dr. Olczak for a significant flare-up in her neck pain.  Tr. 363.  The pain medication injections she received did not help.  Id. Jackson had gone to the emergency room in October 23 and November 26, 2002 for her pain.  Id.  Jackson had asked for narcotic pain relief, which she normally did not want.  Id.  She had been on Vicodin and some Percocet and Valium.  Id.  Dr. Olczak believed that getting another opinion as to whether surgery might be helpful, however, Dr. Olczak also believed that Jackson needed to come to the realization that she would have to be on pain medications chronically.  Id.

On December 19, 2002, Jackson underwent an cervical MRI which showed unremarkable findings for C2-3, C4-5 and C7-T1; a slight disc bulge at C3-4 with degenerative ridging that had been unchanged; a small to moderate broad-based central disc protrusion at C5-6 with mild spinal canal narrowing and without any neuroforaminal encroachment that was unchanged; and a moderate broad based disc bulge with probable nerve rootlet impingement and mild neuroforaminal encroachment. Tr. 299, 385.

On December 27, 2002, Jackson saw Dr. Olczak for a follow-up.  Tr. 362.  Dr. Olczak noted that Jackson had another MRI of her neck that did show some new changes, but she did not believe they were significant enough to warrant surgery. Id. Jackson stated that she was having ongoing problems with severe debilitating pain and that she wanted to have something done, so Dr. Olczak gave her the consent to get another opinion from Dr. Transfeldt.  Id.  Two other doctors had already found that

surgery was not an option.  Id. Dr. Olczak was hoping that if Jackson received a third opinion stating that surgery was not an option that Jackson would accept that opinion. Id.  Jackson also noted that she was having upper right abdominal pain and continued to suffer from constipation.  Id.  Dr. Olczak noted that Jackson had undergone a normal flexible sigmoidoscopy and barium enema.  Id.  Dr. Olczak and other doctors did not believe that Jackson's abdominal pain was anatomical in nature.  Id.

On December 27, 2002, Jackson underwent a CT scan of her abdomen and pelvis areas, which was negative, save for some small lesions in the kidneys and liver that were most likely simple cysts.  Tr. 298, 384.

On January 22, 2003, Jackson saw Dr. Olczak who noted that Jackson's pain situation appeared to be worsening.  Tr. 361.  Jackson had been using more narcotics over the past few months due to chronic neck and abdominal pain.  Id.  Jackson stated that she was not truly constipated, but that if she missed a day then her pain got worse and her bowel movements played some kind of role.  Id.  Dr. Olczak explained that doctors could not find the cause of her pain.  Id.  Dr. Olczak noted that she wanted Jackson to try Zelnorm for her abdomen, but that she was "a little scared to do it."  Id.

On January 28, 2003, saw Dr. Jodi Zenti regarding pain control concerns as to her neck and left hip.  Tr. 360.  Jackson was taking Percocet, but wondered if this was causing the worsening of her bowel habits, which included constipation and diarrhea. Id.  MRIs recently taken of her hip and bowel were unremarkable.  Id.  Jackson indicated that the Percocet did not seem to be controlling her pain.  Id.  Jackson believed that something must be wrong with her because she was in so much pain, and that doctors were pushing pills without figuring out the cause.  Id.  Jackson had a

problem with irritable bowel syndrome and was seeking the opinion of a third neurosurgeon regarding her neck pain.  Id.  Jackson appeared to be sitting on her right hip and was able to move up to the exam table without any difficulty.  Id.  Dr. Zenti could not detect any pelvic pain and pain was centered on the left sacral notch.  Id.  Dr. Zenti believed that the Percocet was helping control the pain, even though it may have been causing constipation, and that she was not getting a lot of relief from her Ultracet.  Id.  Dr. Zenti gave Jackson a Toradol shot for short term pain relief and gave her some Valium to help her better relax at night.  Id.  Dr. Zenti encouraged Jackson to return to the pain clinic for help.  Id.

On January 30, 2003, Jackson saw Dr. Monsein regarding pain to her left hip, right rib cage and diffuse abdominal pain, with alternating constipation and diarrhea.  Tr. 311.  Jackson also complained of continuing neck pain with tingling in her right arm.  Id.  According to Jackson, the pain medications made her pain worse.  Id.  Dr. Monsein noted that recent MRIs showed that her left hip, pelvis and abdomen were normal, save for benign cysts.  Id.  In addition, films of her cervical spine showed loss of cervical lordosis (a curve in the neck vertebrae), lumbar films were normal, shoulder films were normal, and colonoscopy with only a small polyp.  Id.  Jackson did not appear to be in acute distress, had some upper quadrant abdominal tenderness without guarding, and no neurological issues other than decreased range of her cervical spine.  Id.  No motor or sensory defects were noted and the straight-leg testing was negative.  Id.  Dr. Monsein stated that he did not know what was going on with Jackson and while there may be a physical cause, Dr. Monsein believed there was a mental component.  Tr. 312.  Dr. Monsein noted that all of the tests performed on her had been unremarkable

and it was his opinion that they were not going to find a specific diagnosis for her.  Id.
Dr. Monsein noted that treatment of her anxiety and depression was important in terms
of pain management.  Id.

In March 2003, Jackson saw Dr. Albert Czaja, a gastroenterologist and
heptalogist at the Mayo Clinic, for an evaluation of bowel irregularity and cysts on the
liver and kidneys.  Tr. 780.  Dr. Czaja diagnosed Jackson with chronic constipation
associated with bowel dysfunction, inactivity, chronic pain syndrome, narcotic analgesia,
and simple cysts of the liver and kidneys.  Tr. 778.  Dr. Czaja prescribed an irritable
bowel class for behavioral modification and dietary instruction, continued efforts at stool
softening, fiber supplement, fluids and exercise, along with her continued efforts at pain
management.  Tr. 779, 782.

On April 8, 2003, Jackson saw Dr. Transfeldt for an evaluation as to whether
surgery was a viable treatment option for her arm, neck and shoulder pain.  Tr. 328-30.
The physical examination of Jackson showed diffuse tenderness and spasm of the
paraspinal muscles and decreased range of motion of her cervical spine due to her
pain.  Id.  There were no radicular, motor or sensory deficits.  Id.  Dr. Transfeldt
reviewed her MRI that showed multilevel disc degeneration and a slightly larger disc
protrusion at C6-7 causing moderate root impingement.   Dr. Transfeldt could not
attribute all of Jackson's symptoms to this specific disc herniation.  Id.  While Jackson
may have had an underling organic problem causing her pain, Dr. Transfeldt found that
there is no "definable abnormality or surgical operation that is likely to get rid of her
symptoms."  Id.

On April 16, 2003, Jackson saw Dr. Olczak for a follow-up of her chronic pain syndrome and chronic constipation. Tr. 359. Dr. Olczak noted that Dr. Transfeldt noted that surgery was not an option for her neck unless her condition worsened. Id. Jackson had been taking eight Ultracet and three Valium per day for pain management and that she was pretty much getting along with that medication regimen. Id. Jackson indicated that she was considering legal action related to her 1998 automobile accident and wanted Dr. Olczak to look at some documents. Id. Jackson also indicated that she was going to try acupuncture for her pain. Id. Jackson was continued on the existing medication regimen. Id.

On May 28, 2003, Jackson saw Dr. Olczak for a prescription refill. Tr. 358. Jackson reported that acupuncture had helped with her hip pain and decreases her headaches, but was not helping her shoulder or neck. Id. Jackson had been taking eight Ultracet and six Valium per day for pain management. Id. Dr. Olczak decreased the amount of Valium pills to three a day. Id. Jackson was in good spirits during the visit. Id.

On September 26, 2003, Jackson reported to Tracy with neck and arm pain, muscle tightness and some abdominal pain. Tr. 315. Jackson wanted to continue with conservative treatment for her pain. Id. She decided to try physical therapy, which had provided her with quite a bit of relief in the past. Id. Jackson did not want to use injections to treat her pain. Id. Jackson showed a decreased range of motion of the neck, she could almost touch her neck with her chin, rotation of her neck was 20% of normal, the reflexes in her upper extremities were active and normal, there were no sensory deficiencies and she complained of muscle tenderness. Tr. 315-16.

On October 22, 2003, Jackson saw Dr. Olczak regarding her hip pain.  Tr. 357.
Dr. Olczak noted that Jackson had chronic neck pain and bowel mobility issues, but that
Jackson's biggest concern was her hip pain.  Id.  Jackson wanted to have a MRI
ordered in order rule out her back as a cause of the pain, although Jackson did not
believe that her back was the cause of the hip pain.  Id.  Jackson stated that she was
constantly in pain.  Id.  Jackson had not been taking any narcotics, but Dr. Olczak
believed that may be the path to follow given that the more conservative methods of
physical therapy, acupuncture and message had not worked.  Id.  Jackson was to
continue taking eight Ultracet and three Diazepam (Valium) a day.  Id.

On October 24, 2003, Jackson had an MRI of her lumbar spine, which was
normal.  Tr. 383.

On November 7, 2003, Jackson saw Dr. Monsein for her neck pain.  Tr. 317.
Jackson was still complaining of severe back pain, which would start as soon as she
stood up or when she performed any activities around her house.  Id.  Dr. Monsein
noted that Jackson had multilevel cervical DDD with a small disc herniation and
possible left C7 impingement.  Id.  Jackson was not a surgical candidate, as the
surgeon could not find an abnormality that such an intervention would help.  Id.
According to Jackson, other methods of treatment made her pain worse.  Id.  Dr.
Monsein stated that Jackson was not able to work, she was only able to do limited
activities, and she had indicated to him that there was a fair amount of stress in her
home.  Id.  His examination of Jackson showed limited range of her cervical spine in all
directions, tenderness and pain upon palpitation or compression in the cervical region,
but no gross motor or sensory defects in the upper extremities.  Id.  Dr. Monsein's

impression was myofasical pain, multi-level cervical disc disease, and chronic pain syndrome.  Id.  While Dr. Monsein appreciated the fact that Jackson experienced a great deal of pain and that this pain limited her daily activities, there were not many treatment options for her, other than going to get a second opinion on surgical options or long term opioid use.  Tr. 317-18.

On December 18, 2003, Jackson saw Dr. Olczak regarding pain in her hip and bowel area.  Tr. 356.  Jackson had been previously diagnosed with irritable bowel syndrome and sometimes had problems emptying her bowel.  Id.  Jackson tried to have a GI work-up at the Mayo Clinic, but could not complete all of the testing due to pain.  Id.  When Jackson was suffering from constipation she would use Milk of Magnesia, which would help, but then the pain would gradually increase again.  Id.  While Jackson was diagnosed with irritable bowel syndrome, Dr. Olczak, believed that the pain Jackson experienced was too extreme for that condition and wondered if she had some sort of unusual motility issues that caused her not to be able to empty her bowel in an area with increased pain receptors.  Id.

On January 30, 2004, Jackson consulted with Dr. Kathryn Stolp related to pelvic floor myalgia.  Tr. 789.  Jackson appeared angry and depressed in appearance.  Id.  Her strength, gait, coordination, reflexes and sensation were normal in her lower extremities.  Id.  Jackson had good motion in all directions of her lumbar spine, although she reported pain in the left lumbar sacral area with all movement.  Tr. 790.  Jackson was unable to move her cervical spine, and refused to participate in that part of the examination for fear of exacerbating her pain further.  Id.  She had normal sphincter and there was significant tightness and tenderness of the pelvic floor musculature.  Id.

Jackson refused to try any of the treatment options suggested by Dr. Stolp because she said she had tried them and they did not work, including re-entering the chronic pain rehabilitation program and receiving further pelvic floor treatment, and she refused any further pain management. Id. Jackson was diagnosed with chronic pain syndrome and chronic pelvic floor tension myalgia. Id.

On January 30, 2004, Jackson was seen by Dr. Vandana Nehra relating to pain in the left hip and vaginal infections. Tr. 787. A barium enema performed was negative and defecating proctogram demonstrated normal function. Id.

In a February 17, 2004, progress report, Dr. Olczak noted that Jackson was suffering from chronic hip and pelvic pain and was suffering from re-occurring constipation. Tr. 353. Doctors felt that the pain in her pelvis might be the result of pelvic floor myalgia, causing tightness in her pelvic muscles. Id. Jackson was using eight Ultracet per day, along with one Valium. Id. Jackson was limiting herself to one Valium per day even though her neck pain was worse with only one a day and that she wanted to avoid the use of narcotics for pain management. Id. Jackson reported that she was depressed and that her appetite had decreased, so she was started on Zoloft. Id. Jackson was also given samples of Skelazin, which is a muscle relaxant. Id. Dr. Olczak stated that Jackson has a very complicated problem, but noted that "[w]e were never really able to elucidate what the exact cause of her pain is, but that she has been very compliant and has followed through with all recommended treatment and has always tried to avoid excessive narcotic use. . . ." Id. Dr. Olczak believed that Jackson was a candidate for chronic pain management. Id.

On April 28, 2004, Dr. Monsein issued a letter to an insurance provider stating that for Jackson to return to work, she was need to find sedentary work activities and she would require a high degree of motivation on her part. Tr. 319. Dr. Monsein also stated that since he had not treated Jackson in the past six months, he was not comfortable completing a physical abilities assessment. <u>Id.</u> Dr. Monsein went on to state:

> I certainly would support the idea of Roxanne trying to get back to some type of gainful employment. She is a relatively young individual and unless she clearly has significant chronic problems, I believe it is in her best interest to try to find some type of lifestyle that would provide her with a more functional living situation.

<u>Id.</u>

On May 18, 2004, Jackson had a MRI performed of her pelvis and abdomen that showed no abnormalities other that a stable cyst with the liver and kidneys. Tr. 381.

On June 28, 2004, Jackson saw Dr. Olczak regarding her emotional difficulties she was experiencing based on her decision to file for divorce and the resulting financial difficulties, and neck and arm pain. Tr. 349. Jackson had been receiving Botox shots in her pelvis, which had helped her with the pain and she felt as though her bowel movements were getting better. <u>Id.</u> Dr. Olczak was concerned about Jackson's Valium use, which was six a day. <u>Id.</u> Jackson had a chronic issue with pain, which made her a candidate for depression and recent events had exacerbated things for her. <u>Id.</u> Jackson was concerned about what she was going to do financially after the divorce and stated she was planning on filing for social security benefits. <u>Id.</u> Dr. Olczak believed that Jackson was suffering from chronic neck pain, chronic bowel or pelvic pain, and issues with depression. <u>Id.</u>

On July 9, 2004, Jackson saw Dr. Transfeldt for another opinion regarding surgical options. Tr. 331. Her symptoms were neck pain without radicular findings. Id. Upon examination, Jackson had a reduced range of motion of her cervical spine, but had no clear cut motor or sensory defects involving the upper extremities. Id. Jackson's x-rays showed no dynamic instability of the cervical spine. Id. Dr. Transfeldt had nothing to add from his previous opinion regarding treatment option except that Jackson continue with conservative treatment. Id. Dr. Transfeldt also opined that "together with other medical issues, I really do not feel that she will be able to pursue and regular, gainful employment." Id.

On August 3, 2004, Jackson saw Dr. Olczak regarding her ongoing medical problems, including her neck and arm pain. Tr. 348. Jackson was taking Ultracet and Diazepam and was planning to wean herself off of Diazepam and try Nortriptyline. Id. Jackson noted that she was going through a divorce and her husband was accusing her of being a drug addict. Id. Jackson had some hemorrhoids and was obtaining relief using Preparation H. Id. Jackson talked to Dr. Olczak about seeing another neck surgeon because that is what her lawyer recommended. Id. Jackson stated that she was limited in her daily activities and that the medication kept her functional to the point that she was not in bed all day, which is what she would feel like doing if she was not her medications. Id. Dr. Olczak indicated that Jackson was "pretty much incapable of working." Id. Jackson was to continue taking Ultracet for her pain and wean herself off of diazepam. Id. Jackson also planned on applying for social security benefits. Id.

On August 19, 2004, Jackson underwent an MRI of her cervical spine. Tr. 379. The MRI showed no abnormalities at C2-3, C4-5 and C7-T1. Id. The impression

36

otherwise was moderate cervical spondylosis[6] at C5-6 and C6-7. Id. C6-7 was somewhat asymmetrical extending to the left of midline causing mild narrowing in the region of the exiting nerve root sleeve of C7 on the left. Tr. 379-80. The MRI also showed mild cervical spondylosis at C3-4. Id. Other findings were that there was no malalignment apparent, no signal abnormality of the cervical cord was apparent, and the craniocervical junction was unremarkable. Tr. 379.

On August 25, 2004, Jackson reported rectal pain to Dr. Olczak. Tr. 347. Dr. Olczak found no abnormalities, except for a small hemorrhoid. Id. Another doctor concurred with her assessment and noted that Jackson was ready to pass a stool. Id.

On October 5, 2004, Jackson saw Dr. Andrew Smith for consistent pain in the neck and in both shoulders, which she reported was aggravated by any movement of the head and neck (side-to-side, front or back). Tr. 396. Id. Jackson also complained of numbness in her hands, more on the right side, especially in the index finger. Id. Jackson also noted generalized weakness. Id. Jackson was taking Valium and Ultracet for her pain. Id. Jackson wanted an opinion if anything surgical could be done to treat her pain. Id. During the examination, Jackson showed no acute distress, held her neck very straight and had very limited movements of her neck, with any movement causing pain in her neck, shoulder and trapezius, but not radicular in nature. Tr. 397. Jackson was guarded when Dr. Smith attempted to test her muscle strength, so it was difficult to determine whether there was true weakness in her muscles, because such testing aggravated her right shoulder pain. Id. There was some tenderness with pressure over

---

[6]    Spondylosis: "Degeneration or deficient development of a portion of the vertebra. . . ." Stedman's Medical Dictionary (27th ed. 2000).

the right shoulder.  Id.  She had apparent hypesthesia[7] in the index finger of the right hand, but no Tinel's sign[8] over the unlar nerve or wrist.  Id.  Jackson showed equal and symmetrical reflexes in her triceps and biceps and in her lower extremities.  Id.  The MRI showed early signs of degenerative changes at C5-6 and more obvious changes at C6-7 in a very straight spine without a normal lordosis, and no evidence of a spinal cord or spinal nerve root compression.  Id.  Dr. Smith's assessment was chronic pain syndrome in the neck and shoulders, possible shoulder impingement syndrome, and numbness of right finger with no known cause.  Id.

On October 27, 2004, Jackson underwent an EMG for the evaluation of right cervical radiculopathy[9] by Dr. Eric Schenck.  Tr. 399.  Dr. Schenk stated that Jackson did not appear to be in acute distress during the test, her strength, sensation and reflexes were intact.  Id.  Jackson showed no atrophy in her hands.  Id.  The nerve conduction velocity for EMG test regarding the right upper extremity was normal.  Tr. 400.

On November 24, 2004, Jackson saw Dr. Allan Hunt for her right shoulder pain. Tr. 401.  According to Jackson, any activity away from her body was uncomfortable, including reaching overhead, throwing and picking up objects.  Id.  It was difficult for her to lie on her shoulders, put on a coat or exercise.  Id.  Her shoulders felt weak and stiff and she noted inconsistent tingling in her right finder.  Id. Jackson had tried ice, heat,

---

[7]    Hypesthesia: "Diminished sensitivity to stimulation."   Stedman's Medical Dictionary (27th ed. 2000).

[8]    Tinel's Sign: "The sign that a nerve is irritated."   http://www.medterms.com/script /main/art.asp?articlekey=16687

[9]    Radiculopathy: "Disorder of the spinal nerve roots."   Stedman's Medical Dictionary (27th ed. 2000).

rest, narcotics and muscle relaxants.  Id.  She had not tried injections into her shoulders.  Id.  Jackson had also undergone physical therapy, Botox therapy to help her abdomen, and acupuncture.  Id.  Jackson was taking Premarin, Valium and Ultracet.  Id. During her examination, Jackson was in no apparent distress and her neurological examination was normal.  Tr. 402.  Jackson had full range of motion with her neck without any pain.  Id.  Jackson was tender to midline palpitation.  Id.  Her side bending was limited, with no instability noted.  Id.  Her range of motion of moving side-side was 180 degrees.  Id.  The MRI showed some minimal arthritis in the acromioclavicular joint with no other remarkable findings.  Id.  Jackson was assessed with bilateral shoulder impingement and Dr. Hunt believed that an injection of Depo-Mederol and Marcaine would provide good relief, which was performed by Dr. Hunt.  Tr. 402-03.  After five minutes, Jackson had no impingement and could reach around her back.  Tr. 403.

On January 11, 2005, Jackson met with Dr. Hunt for a follow-up.  Tr. 404. Jackson reported that the injections had provided her with good relief from her shoulder pain.  Id.  Jackson was given another injection in the shoulder.  Id.  Dr. Hunt stated that she could undergo a scope, decompression and distal clavicle excision.  Tr. 405.  On March 23, 2005, Jackson underwent this procedure at Methodist Hospital.  Tr. 407-09.

On May 13, 2005, Jackson had a MRI of her pelvis, which was "unremarkable" for the most part with masses, and with "no focal findings to explain patient's persistent pelvic pain."  Tr. 435.

On May 17, 2005, Jackson met with Dr. Hunt for a follow-up regarding her status after the shoulder surgery.  Tr. 411.  Jackson indicated that her shoulder pain was gone, but that she now had pain over her scapula and trapezial areas.  Id.  Dr. Hunt also

noted that Jackson was doing well, and would use a TENS unit to deal with her scapula and trapezial pain.  Id.  Dr. Hunt wanted to see Jackson in two to three months for recheck.  Id.

On August 2, 2005, Jackson met with Dr. Hunt for a follow-up regarding her status after the shoulder surgery.  Tr. 412.  Jackson was still having problems with her shoulder.  Id.  Jackson had no other musculoskeletal complaints or other symptoms.  Id.  Dr. Hunt noted that Jackson stopped her formal therapy and never continued the strengthening exercises.  Id.  Dr. Hunt noted that Jackson was very weak in the shoulder, which could result in not offering sufficient support of her joint.  Id.  Dr. Hunt gave Jackson an injection to alleviate the pain so as to allow Jackson to properly rehabilitate.  Id.

On September 19, 2005, Jackson had adhesions removed from her pelvis.  Tr. 392, 439.

On November 1, 2005, Jackson met with Dr. Hunt for a follow-up regarding her status after her shoulder surgery.  Tr. 413.  Jackson reported that she had laparoscopic surgery after the August 2, 2005 consultation.  Id.  In addition, Jackson had undergone physical therapy and reported that her shoulder pain had improved significantly.  Id.  Jackson had no other musculoskeletal complaints or other symptoms, although she complained that her left shoulder was bothering her, which Dr. Hunt thought was due to over use.  Id.  Dr. Hunt was pleased with how Jackson was doing and wanted to continue to increase her activity as tolerated.  Id.

On October 8, 2007, state agency consultant physician Dr. Thomas Chisholm, performed a residual functional capacity assessment of Jackson based on a document

review for the time period of February 12, 2002 through December 31, 2005. Tr. 445. Dr. Chisholm found that Jackson could occasionally lift 50 pounds, frequently carry 25 pounds, stand or walk for 6 hours in an 8 hour work day, sit for 6 hours in an 8 hour work day, and was limited in the push and pull with her upper extremities. Tr. 449. In support of his assessment, Dr. Chisholm noted that there were no neurological or radicular signs or fibromyalgia; and there were multiple MRIs indicating minimal change in her shoulder, a negative L-spine, degenerative changes in the cervical spine, and a negative study of the hip. Tr. 450. Dr. Chisholm opined that Jackson could frequently climb stairs, balance, crouch, and crawl; and she could occasionally climb a ladder, stoop and kneel. Tr. 450-51. Dr. Chisholm also opined that Jackson was limited in the area of reaching in all directions, and in particular, with frequent motions above the head. Tr. 451. Jackson had no other manipulative, visual or communicative limitations and had no environmental limitations, except for concentrated exposure to hazards. Tr. 451-52. Dr. Chisholm found Jackson's symptoms were disproportionate to the clinical findings. Tr. 453. Dr. Chisholm noted that the last and only statement of disability was by Dr. Monsein (dated April 28, 2004 (Tr. 319)), who was reluctant to make a definitive judgment as he had not seen Jackson for a period of time, but Dr. Monsein did mention that a sedentary position would be appropriate if she were to return to work. Tr. 454. Dr. Chisholm's findings and recommendation were upheld on reconsideration by state agency consultant physician Dr. Eames Sandra. Tr. 469-71.

On March 19, 2007, Jackson had a physical work performance evaluation ("FCE") at Ergo Science by Megan Bentley. Tr. 881-91. The evaluation indicated that Jackson could occasionally lift up to 10 pounds, carry up to 12 pounds, push 19 pounds,

and pull 16 pounds; she could sit and stand frequently; work with her arms overhead or bend over occasionally; and frequently kneel, climb stairs, squat, walk, crawl and climb a ladder.  Tr. 884.  Testing also showed that Jackson could frequently reach at waist level, frequently reach below waist level, constantly handle objects, and perform constant fingering.  Tr. 885.  There were no changes in Jackson's musculoskeletal status from the beginning of testing to the end, and her gait pattern did not change.  Id. Jackson also showed normal grip strength.  Tr. 886.  Attached to this evaluation was a form asking the responder to check the boxes corresponding to Jackson' level of physical functioning.  Tr. 890-91.  The unnamed responder stated that Jackson suffered from chronic neck, shoulder and abdominal pain.  Tr. 890.  The responder checked that Jackson could continuously (5.5 plus hours a day) engage in fine manipulation, simple grasp and firm grasp; frequently (2.5-5.5 hours a day) sit, stand, walk, kneel, crouch, and crawl; occasionally (less than 2.5 hours per day) lift 10 pounds, carry 12 pounds, push 19 pounds and pull 16 pounds; and her balance was adequate.  Tr. 890-91.

On June 18, 2007, Dr. Olczak wrote a letter directed "To Whom it May Concern" in response to a request for a narrative report."[10]  Tr. 879-80.  In this letter, Dr. Olczak stated that Jackson had longstanding problems with chronic neck pain and chronic shoulder pain and a secondary problem of chronic abdominal pain as well, with which she struggles.  Tr. 879.  Dr. Olczak noted that while the surgery on her shoulder that provided some improvement, she continued to have shoulder pain.  Id.  Dr. Olczak stated that Jackson was taking medication for her pain to help her sleep, and muscle relaxants.  Id.  Dr. Olczak opined that Jackson was very limited in her ability to work.  Id.

---

[10]     This letter was included in the documents from Ergo Science. Tr. 879-91.

Dr. Olczak acknowledged that an FCE had been done, which Jackson passed, and that she could see that Jackson probably would be able to do things within the time constraints of a functional capacity, but stated that based on her experience with Jackson, if she was to do any kind of pushing, pulling, lifting, sitting or standing for prolonged periods, she would have significant exacerbation of her pain.  Id.  Dr. Olczak indicated that Jackson had stated to her that when she is not working, she has to lie down at times or she has to use a muscle relaxant to be able to make it through the day.  Id.  Dr. Olczak was confident that if Jackson was to work full-time, her pain would deteriorate and her quality of life would deteriorate significantly.  Id.  In addition, Dr. Olczak felt that Jackson was doing relatively well on her current regimen and that is only because she was not forced to over exert herself.  Tr. 880.

On September 18, 2007, Jackson underwent an independent medical examination by Dr. Jetzer,[11] who also conducted a review of available medical documents from 2002-2007.  Tr. 554-64.  Jackson informed Dr. Jetzer that she had been in a car accident in 1998; she has had right shoulder and neck pain, along with continued abdominal pain and constipation since that time; she had many treatments, had seen various physicians and had been to physical therapy; and was seen at the Mayo Clinic for abdominal pain and the Sister Kenny Institute for rehabilitation.  Tr. 555. Jackson reported that she had right shoulder surgery by Dr. Hunt in 2005.  Id.

---

[11]    There is no indication for whom Dr. Jetzer was conducting the IME.  However, at the end of the report, he referenced Jackson's effort to "attribute every pain she has had and discomfort to the motor vehicle accident in 1998," suggesting that perhaps the IME was conducted in connection with this accident.  Tr. 564.  Additionally, Dr. Jetzer indicated that because Dr. Olczak had disagreed with the FCE performed in March 2007, the IME was recommended.  Tr. 557.

Jackson denied any symptoms except pain in her shoulder, right neck pain and stiffness, and stated it hurt to turn her head more than 60 degrees.  Id.  She stated she continued to drive a car, rested a lot, and she could no longer do various activities that she had done before.  Tr. 556.  Jackson indicated that she had a functional capacity examination which stated what she could do a on a good day.  Id.  Jackson said she felt a lot of pain in her back, neck and shoulders after this evaluation.  Id.

Dr. Jetzer reviewed and summarized numerous medical records from 2002 to 2007, including the FCE performed on March 19, 2007 (concluding Jackson could perform sedentary work), and Dr. Olczak's June 18, 2007 letter (disagreeing with the FCE).  Tr. 566-560.

Dr. Jetzer stated that his clinical examination of Jackson indicated that she "appeared to move and function normally without any pain or discomfort whatsoever, either getting out of the chair, on the table or walking out of the clinic."  Tr. 560.

On physical examination, Dr. Jetzer indicated that on distraction, Jackson only turned her head about 30 degrees, but when she looked at Dr. Jetzer involuntarily, she had about 60 degrees of comfortable rotation of her neck, and was almost able to touch her chin to her neck.  Tr. 560.  The shoulder examination revealed normal rotation on both sides and no tenderness in the joint where she had the clavicle excision; she had good hand grip in both hands and no atrophy of the hands; no pain or spasms was noted in her cervical, thoracic or lumbar region; she was able to heel and toe walk; flexion in her back was 90 degrees and extension was 30 degrees; straight leg raising was negative when lying and sitting; rotation was negative on the right and left; and her bowels were normal.  Id.

44

Dr. Jetzer stated that Jackson's complaints and degree of physical limitations were not supported by his examination findings, and in fact, Jackson had told Dr. Jetzer that she could go back to her previous job, although she was concerned about the hours. Tr. 556, 561, 563. Based on the FCE, his review of the records and examination of Jackson, Dr. Jetzer opined that Jackson could return to work and perform fulltime employment, at least at a sedentary capacity and possibly at a light capacity. Tr. 561-563.

Dr. Jetzer disagreed with the statements of disability by her physicians, "as [these] enabling opinions . . . have not been justified by her clinical findings." Tr. 563. At the end of his report, Dr. Jetzer acknowledged that both Jackson's neck and shoulder pain were degenerative conditions, and that she had abdominal problems related to her hysterectomy, secondary adhesions and irritable bowel syndrome. Tr. 564. However, despite these complaints of symptoms, Dr. Jetzer opined that Jackson should have been able to return to work sometime between 2000 and 2005, and at the latest, after her shoulder surgery in 2005. Tr. 562, 564.

On November 15, 2007, Jackson reported to Dr. Maurer that pain aggravated by bending, crouching, housework, stress, tension and twisting were improved with heat, changing positions, medication and rest. Tr. 463. Jackson also reported that injections provided short-term relief and acupuncture benefited her. Id.

On December 11, 2007, Dr. Maurer stated in a "To Whom It May Concern" letter that because Jackson was limited by chronic pain and had undergone extensive treatment, she could not work and required ongoing disability. Tr. 467. Dr. Maurer indicated that Jackson was restricted with sitting, standing and carrying, but did not

45

identify what these restrictions entailed.  Id.  Dr. Maurer also noted that Jackson needed to lie down "frequently" due to her pain.  Id.

On December 13, 2007, Dr. Presthus in a "To Whom It May Concern" letter, noted that Jackson had undergone a laparoscopy to remove pelvic adhesions, which provided Jackson with some pain relief, but that pain had progressively become worse to the point that second laparoscopy was necessary.  Tr. 468.  Because of her history of chronic pelvic pain, Dr. Presthus opined that Jackson was unable to perform normal work activities.  Tr. 468.

On July 16, 2008, Jackson reported to Dr. Goetz that the pelvic floor exercising prescribed to her had caused her severe spasms, stated that it was not going to help and that she considered cancelling her biofeedback appointment.  Tr. 521.  Jackson was discharged from the biofeedback program due to her complex pain that required more treatment than biofeedback.  Id.

Dr. Savanna Borne stated on December 2, 2008, that Jackson was inconsistently treating her bowel issues and was using numerous health care providers. Tr. 683. Dr. Borne encouraged Jackson to continue the use of soluble fiber and to use a laxative if necessary.  Id.  Dr. Borne noted that the CT of Jackson's abdomen performed in August 19, 2008, showed moderate stool in the colon with no obstruction and that was similar to a study obtained in February 12, 2007, and that she had a normal colonoscopy performed on June 9, 2008.  Id.  Dr. Borne refused to order any additional tests for Jackson, as she was suffering from constipation and colon spasms that would change over time and it was difficult for Dr. Borne to even understand Jackson's self-treatment for her bowel problems.  Id.

46

On May 27, 2009, Jackson reported neck pain with grossly reduced range of movement to Dr. Mullaney, but she denied any radicular pain into her arms. Tr. 727. Her neurological evaluation was normal with respect to wrist extension, wrist flexion and strength in her biceps, triceps, deltoids and grip strength. Id. Jackson also reported that she did have surgery performed on her right shoulder that had "been very helpful." Id.

### B. Medical Records Submitted to Court

On June 24, 2003, Dr. Monsein and physical therapist Tracy filled out a functional capacities check list form related to Jackson's insurance. See Pl.'s Aff., Ex. C. The checklist stated that Jackson could frequently sit (1/3 to 2/3 of the time) and occasionally sit (up to 1/3 of the time); occasionally stand, walk, squat, bend, knee, drive, push, pull, reach, grasp, and engage in repetitive motions (with wrists, elbow, shoulder or ankle); occasionally lift less than 10 pounds; and was unable to climb or lift or more than 10 pounds. Id. The objective medical findings that these opinions were based upon was the cervical MRI taken on December 19, 2002, a 1998 lumbar MRI,[12] and a Mayo Clinic report dated March 17, 2003.[13] Id.

In a May 11, 2004 letter to Cigna, Dr. Olczak stated:

> At this point I don't know that she will be able to return to work. The pain she has is chronically debilitating to her. Some days it is a chore for her to get out of bed. Other days she is able to get out, but basically she's chronically

---

[12] This MRI is not part of the records before this Court.

[13] Dr. Monsein and Tracy did not provide any other information regarding the Mayo Clinic Report. However, assuming the report they were referencing was the March 17, 2003 letter and attachments by Dr. Czaja (Tr. 778-86), as described above, Dr. Czaja is a gastroenterologist and heptalogist and the purpose of the consultation was to evaluate Jackson's complaints of bowel irregularity and cysts on the liver and kidneys. Tr. 780.

> incapacitated by this. . . She basically can't do one activity
> for longer than a couple of hours because if she sits for too
> long it will aggravate her pain. If she stands too long it will
> aggravate it. If she walks too long it will aggravate a pain, so
> she's constantly having to change her position. She really
> can't do anything much in the way of physically because of
> her problems.

See Pl.'s Aff., Ex. D. Dr. Olczak cited to a variety of unnamed MRIs that showed some

unidentified deficits, none of which she claimed were correctable by surgery. Id. Dr.

Olczak noted that Jackson had gone through various forms of treatment, including

acupuncture, physical therapy and pain clinics and takes pain medication. Id. Dr.

Olczak also cited to pelvic floor problems and issues with constipation. Id.

## C. Hearings Before the Administrative Law Judges

### 1. September 17, 2008 Hearing Before Administrative Law Judge George Gaffaney

Jackson testified that her constant neck and back pain, pelvic floor problems,

severe constipation and adhesions kept her from working. Tr. 901-02. Jackson noted

that her back pain was better when she stood up and that she believed that it was

caused by her pelvic floor problem and pressure. Tr. 902. Jackson also testified that

the pain she was suffering interfered with daily activities. Tr. 910. Jackson stated that

she did a little housecleaning at a time (i.e, put some dishes in the dishwasher, cook

with help, and handling the laundry with help). Id. According to Jackson, sitting was

very painful for her and she could not sit for more than 20 minutes without pain,

standing caused her neck to swell up, and that she had no problems walking. Tr. 911-

12. She also stated that she could occasionally lift 5-10 pounds. Tr. 913. Typing at a

computer for 15-20 minutes gave her a stiff neck, and she had trouble turning her neck

when driving. Tr. 914-15. Jackson went out once a month with her girlfriends to eat.

48

Tr. 918. Jackson testified that none of treatments she has received has resulted in long-term pain relief. Id.

## 2. August 16, 2010 Hearing Before ALJ

At the August 16, 2010 hearing, Jackson testified as follows: She drove a car once or twice a week. Tr. 40-41. She had flown to Florida trip four times over the past several years to see her mother. Tr. 41. She does not garden, but she is able to water her flowers. Id. She never had surgery on her neck, as the surgeons stated that would not help her condition. Tr. 42. She can do activities without pain, but the next day or later in the night she feels pain. Tr. 44. She stated that surgery of her shoulder in 2005 made it so she could move her right arm more, but that she still had problems with the muscle in her shoulder and neck area. Tr. 45. She noted continuing issues with using her arm due to muscle spasms. Tr. 46.

Between 2002 and 2005, Jackson described that in a typical day she took a hot shower in the morning and got back into bed. Tr. 46. She claimed she did few household chores. Id. She testified that she had no problems standing or walking, but would get sore sitting and needed to move around. Tr. 47. Jackson indicated that her maximum lifting weight had been set at 15 pounds and that she did not have to do any lifting at her old job. Tr. 47.

The ALJ asked the VE questions regarding a hypothetical person of Jackson's age and functional capacity. Tr. 48-50. First, the ALJ asked if Jackson could perform her past work (which the he described as medium level work with additional restrictions of no ropes, ladders, or scaffolds; occasional stooping and kneeling; no frequent motions above the head with the right upper extremity; avoid hazardous machinery and

49

unprotected heights) and the VE testified she could. Tr. 49. Next, the ALJ asked the VE if Jackson could perform light level work, but with a lifting restriction of 10-15 pounds, and the VE opined that Jackson could work as a file clerk, check/cashier and general clerk. Id. Then the ALJ asked the VE if Jackson were permitted to work at the sedentary level (with restrictions of sitting or standing up to six hours; walking up to six hours; frequently reaching desk level and below; occasionally or rarely reaching overhead over her shoulder; able to do continuous fine manipulation, simple grasping, lift no more than 10 pounds and carry up to 12 pounds), whether she could perform her past work, and the VE said yes. Tr. 49-50.

## V.    DISCUSSION

Jackson asserted that as defendant had failed to raise any specific issues of fact, she was entitled to judgment as a matter of law. Plaintiff's Memorandum at Law [Docket No. 8] ("Pl.'s Mem."), p. 5. Specifically, she stated:

> The documents in the present case reveal that Defendant has failed to raise any specific issues of fact to preclude Summary Judgment. Therefore, Summary Judgment is appropriate in the instant case.
>
> In his Answer to Plaintiff's Summons and Complaint, Defendant generally denies the allegations contained in Plaintiff's Complaint, and otherwise states that he has insufficient information to form a belief as to their accuracy. However, Defendant never served Plaintiff with any form of discovery in an effort to obtain the information he would deem sufficient.
>
> Defendant has failed to produce any specific facts or affirmative defenses to refute Plaintiff's entitlement to the social security disability benefits which are the subject of this action. Further, Defendant has failed to raise any specific issue of fact which would justify a trial by the Court. Therefore, Claimant is entitled to Summary Judgment.

> Defendant has failed to consider the medical opinions and supporting records of a variety treating professionals.

Id.

To support her last argument, Jackson pointed to the November 2, 2000, RFC assessment performed at the Institute for Occupational Rehabilitation by physical therapist Sharon Olson, which recommended Jackson not return to work among other restrictions; the November 13, 2000 email stating that Jackson's long-term disability benefits were being continued; the June 24, 2003 RFC assessment completed by Dr. Monsein, stating that Jackson could not work and restricting her to lifting less than ten pounds occasionally, standing, walking and bending occasionally, and sitting frequently (but needing to change position every 30 to 60 minutes); the opinions of Dr. Olczak dated May 14, 2004, Dr. Transfeldt dated July 9, 2004, and Dr. Maurer dated the December 11, 2007, stating that Jackson could not work; and the March 23, 2005 records from Methodist Hospital showing her severe impairments and injuries. Id., p. 2.

The Commissioner countered that he had properly responded to her Complaint and that traditional discovery is generally not done (or permitted) to move for summary judgment in his favor. Defendants' Memorandum in Support of Motion for Summary Judgment [Docket No. 16] ("Def. Mem."), pp. 12-13. Instead, the Commissioner is required to place the transcript into the record with his answer to the Complaint, and then based on that administrative record, the Court has the power to enter judgment "upon the pleadings and transcript of the record." Id., p. 12 (quoting 42 U.S.C. § 405(g)). Further, the Commissioner asserted that he had properly responded to Jackson's Complaint. Id., p. 13.

The Commissioner also argued that the ALJ properly considered the medical source opinions, giving greater weight to opinions that were consistent with and supported by the record as a whole. Id., p. 14. The Commissioner noted that while a treating doctor's opinion may receive controlling weight in certain circumstances, the ALJ appropriately found that the "disabled" opinions of Drs. Olczak, Presthus, Transfeldt and Maurer, (Tr. 331, 467, 468), were unjustified based on the objective medical record,[14] and that conclusory assertions by treating physicians that she could not work were issues reserved to the Commissioner and never receive controlling weight or special significance. Id., p. 15-17 (citations omitted). Additionally, the Commissioner, asserted that any limitations placed on Jackson's ability to stand and walk by some physicians were contradicted by Jackson's own testimony that she had no problem standing or walking. Id., p. 16.

As to the specific items of evidence relied upon by Jackson in her brief, the Commissioner argued that Dr. Monsein's opinion in November 2003 that Jackson could not work, was contradicted by Dr. Monsein's opinion in April 2004, where he stated that Jackson could work in a sedentary position, if motivated. Id.

As for the RFC assessment conducted by physical therapist Olson at the Institute for Occupational Rehabilitation on November 2, 2000, the Commissioner maintained that the ALJ appropriately afforded this opinion greater weight, as it was supported by

---

[14] The Commissioner cited to numerous entries in the record reflecting normal MRIs, a normal x-ray, notations regarding nearly normal evaluations and improvements, and comments by Jackson indicating she was doing well or found treatment helpful. Def.'s Mem., pp. 15-16 (citations omitted).

the overall medical record and consistent with the other findings of the ALJ which allowed for Jackson to perform her past work as she performed it. Id., p. 18.

Concerning the November 2000 email addressing long-term disability benefits and the attached Essential Functions form from December 1999, the Commissioner stated that these documents only showed that Jackson had been approved for the continuation of long-term disability benefits, but they did not show that the author was a medical provider or provide any objective support for a claim of disability. Id. As for the surgical documents from Methodist Hospital, the Commissioner agreed that Jackson had surgery on her shoulder, but by her own admission, Jackson had admitted that it was very helpful. Id.

In her opposition to the Commissioner's motion for summary judgment, Jackson challenged the ALJ's reliance on the RFC assessment done by Olson at the Institute for Occupational Rehabilitation on November 2, 2000, given that the report was done at the request of her employer, the assessment provided that she should complete a pain management program before going back to work, and while it was stated that she could work for 20 minutes an hour on a keyboard, the report also recommended that she not use her right hand. See Plaintiff's Memorandum in Opposition to Defendant's Memorandum in Support of Motion for Summary Judgment [Docket No. 17] ("Pl.'s Resp."), p. 1.

Jackson acknowledged that Dr. Olczak had stated that her neck was doing better on August 15, 2002, (Tr. 367), however, she argued that Dr. Olczak was treating her for internal infections, and complications of her neck and shoulder were not brought up at the appointment. Id., p. 2. Jackson challenged the assertion that her CT scans on

53

December 27, 2002 (Tr. 384) and findings by Dr. Czaja of March 10, 2003 (Tr. 779) of her abdomen and pelvis was normal, since they showed small lesions or simple cysts of the kidney and liver and diffuse fatty change in the liver. Id. In addition, Jackson argued that the 2004 opinion by Dr. Monsein that she could work at a sedentary level, was not valid as he had stated that he did not feel comfortable providing an assessment since he had not seen her in six months. Id.

Jackson also argued that the record showed that her cervical spine was not normal, treatment to relieve pain was not working, and she has been compliant with treatment and was not resisting treatment. Id., pp. 2-3. Jackson claimed that the record established that she had serious problems with her hip and abdomen, and took issue with reliance on the state agency physician's RFC. Id.

Finally, Jackson explained that the reference in the record that she took care of her grandson and did other activities, did not take into account that she had to perform these activities and that she experienced pain while doing them. Id.

In sum, Jackson's argument was that the opinions of other doctors could not supersede the opinions of her treating physicals that she was unable to work. Id.

A.    **Procedures Used by Commissioner to Answer Complaint and Move for Summary Judgment**

Jackson took issue with the substance of the Commissioner's Answer to her Complaint. Jackson also questioned the failure of the Commissioner to obtain discovery from her and his failure to produce any specific facts or affirmative defenses to refute her entitlement to benefits.

42 U.S.C. § 405(g), governing complaints contesting a disability termination, provides in relevant part as follows:

> Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.
>
> * * *
>
> As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g).

Additionally, Local Rule 7.2 of the District of Minnesota requires the Commissioner to file an answer and the administrative record and then directs that the parties to file motions for summary judgment and supporting memoranda.

Rule 8(b) of the Federal Rules of Civil Procedure governs an answer to a complaint. It states:

> (1) In General. In responding to a pleading, a party must:
>
> > (A) state in short and plain terms its defenses to each claim asserted against it; and
> >
> > (B) admit or deny the allegations asserted against it by an opposing party.
>
> (2) Denials--Responding to the Substance. A denial must fairly respond to the substance of the allegation.
>
> (3) General and Specific Denials. A party that intends in good faith to deny all the allegations of a pleading-- including the jurisdictional grounds--may do so by a general

denial. A party that does not intend to deny all the allegations must either specifically deny designated allegations or generally deny all except those specifically admitted.

(4) Denying Part of an Allegation. A party that intends in good faith to deny only part of an allegation must admit the part that is true and deny the rest.

(5) Lacking Knowledge or Information. A party that lacks knowledge or information sufficient to form a belief about the truth of an allegation must so state, and the statement has the effect of a denial.

(6) Effect of Failing to Deny. An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied. If a responsive pleading is not required, an allegation is considered denied or avoided.

Fed. R. Civ. P. 8(b).

In compliance with 42 U.S.C. § 405(g), Local Rule 7.2 and Rule 8(b), the Commissioner filed his Answer, entered the administrative transcript into the record, and set out the basis for dismissal of Jackson's suit as part of his motion for summary judgment. Additionally, the Answer properly set forth the Commissioner's response to each of the allegations in the Complaint as required by Rule 8(b). [Docket No 4] The Answer admitted the allegations of certain paragraphs of the Complaint (paragraphs 1-3); it denied the allegations of the remaining paragraphs (paragraphs 4-10); it addressed the Prayer for Relief; and it denied all other allegations of the Complaint not specifically admitted. Id. Nothing more was required of the Commissioner.

## B.   Medical Opinions Considered by the ALJ

The thrust of Jackson's argument is that the ALJ did not give proper weight to the opinions of her various doctors.

The ALJ must consider every medical opinion received, (20 C.F.R. §§ 404.1527(c); 416.927(c)), and the ALJ must resolve the conflicts among the various opinions and reject those conclusions if they are inconsistent with the record as a whole. Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record; on the other hand, an ALJ need not accept the treating physician's opinion if it does not meet those criteria. Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.") (citation omitted). "By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (quoting Kelley v. Cunningham, 133 F.3d 583, 589 (8th Cir. 1998)).

However, there are circumstances "in which relying on a non-treating physician's opinion is proper." Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). When a treating physician's RFC opinion is not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when those opinions are more consistent with the record as a whole. Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007).

Generally, the factors the ALJ should consider in determining the weight to grant a medical opinion include the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; and whether the medical source is a specialist in the relevant medical area.  20 C.F.R. §§ 404.1527(c)(1-5); 416.927(c)(1-5).

"[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement."  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (citing Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)); see also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given to a treating physician's opinion is limited if the opinion consists only of conclusory statements); Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995) (concluding that a conclusory statement by a treating physician is not entitled to greater weight than another physician's statement and "does not amount to substantial evidence of disability.").  Further, conclusory statements by a physician that a claimant is not able to work invades the issue ultimately reserved for the Commissioner.  See Vossen, 612 F.3d at 1015 (issue of disability reserved to Commissioner); Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (citing 20 C.F.R. §§ 416.927(e)(1), (3)) ("a treating physician's opinion that a claimant is 'disabled" or "unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."); Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995) (finding that although medical opinions on the specific amount or hours of work a

claimant can do are permitted and encouraged, treating physicians cannot opine as to whether a claimant can be gainfully employed).

The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician.  Hamilton, 518 F.3d at 610 (citing 20 C.F.R. § 404.1527(d)(2)).  Consequently, whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.  Id. (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)).  "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions."  Id., (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).

As stated previously, the ALJ rejected the statements by Drs. Olczak, Presthus, Transfeldt and Maurer that Jackson could not work due to neck and pelvic pain and limitations on her ability to sit or stand, because these statements were inconsistent with the objective medical records showing sporadic reports of pain, conservative findings, denial of radicular symptoms and improvement with treatment, and Jackson's own testimony that her ability to stand and walk were not affected.  In addition, the ALJ gave no weight to Dr. Monsein's opinion on November 7, 2003 that Jackson could not work, because it conflicted with his opinion dated April 28, 2004, that she could perform sedentary work if she was motivated, but rejected Dr. Monsein's limitation to sedentary work, because it conflicted with the objective medical findings in the record that showed improvement when she participated in treatment.

After a review of the entire medical record, this Court finds no error in the way in which the ALJ considered and weighed the medical evidence and the opinions of

physicians who treated and examined Jackson, along with those who did not. The ALJ's decision was reasonable and based on the substantial record as a whole and it should not be disturbed.

First, the ALJ determined that the medical record did not evidence the type of significant clinical and laboratory abnormalities one would expect to find if Jackson were disabled. Tr. 23. This determination is borne out by the records which showed that while Jackson has clearly had expressed long-standing pain associated with her abdomen and bowels, neck and right shoulder, neither the objective findings nor the treatment for these conditions supported the extent of Jackson's reported of pain.

Jackson first reported abdominal pain and issues with her bowels in April 2002. Tr. 373. At that time she complained of abdominal pain and constipation. Thereafter, Jackson periodically saw physicians for pain associated with her bowels and pelvic floor and constipation. Tr. 294-96, 311, 347, 349, 353, 356, 359-61, 367, 371, 372, 373, 778-93. Throughout this period, Jackson was prescribed relatively conservative treatment including Botox injections (Tr. 349), biofeedback and physical therapy (Tr. 521), a program of bowel conditioning, reduction in narcotic use and a chronic pain management strategy (Tr. 779-82), and removal of adhesions from her pelvic area. Tr. 392, 439. Additionally, Jackson refused to take medication prescribed to her by Dr. Olczak, (Tr. 361), or to pursue the biofeedback and physical therapy prescribed by Dr. Goetz. Tr. 521. Dr. Borne stated on December 2, 2008 that Jackson was inconsistently treating her bowel issues. Tr. 683. All tests, including barium enemas, sigmoidoscopies, CT scans and MRIs related to her abdomen, bowels, hip and pelvis were normal except for evidence of small lesions or cysts. Tr. 292, 294, 298, 362, 381,

384, 386, 388, 435, 787.  Contrary to Jackson's assertion, no provider opined that these small lesions or cysts caused her any problems.

Similarly, with respect to Jackson's neck, while Jackson reported pain and limited motion to her neck to her treating physicians, the examinations and tests showed minimal findings and the treatment was conservative.

On examination, Jackson was found to have tenderness, pain and limited range of motion.  Tr. 288-89, 303, 305, 309, 331, 872.  At the same time, her doctors for the most part found no pain radiating down her arms, good grip in her hands, no gross motor or sensory defects, no muscle weakness, and a benign neurological examination. Tr. 303, 305, 309, 310, 331, 370, 396, 560, 727, 872, 886.  In addition, at the appointment on January 30, 2003, in which Jackson complained abdominal and neck problems, Dr. Monsein noted that all of the tests performed on Jackson that day had been unremarkable and it was his opinion that they were not going to find a specific diagnosis for her.  Tr. 312.  At her appointment on November 24, 2004 with Dr. Hunt to address her right shoulder pain, Jackson exhibited full range of motion with her neck without any pain.   Tr. 402.   Further, on physical examination by Dr. Jetzer on September 18, 2007, Jackson exhibited about 60 degrees of comfortable rotation of her neck, and was almost able to touch her chin to her neck; she had no atrophy of the hands; and no pain or spasms was noted in her cervical region.  Tr. 560.

MRIs, x-rays and an EMG of Jackson's cervical spine did not evidence significant findings.  An MRI taken on January 10, 2002 showed moderate multilevel cervical degenerative disc disease, a small to moderate central disc bulge and a moderate disc complex, but there was "no change since prior exam to explain new symptoms."  Tr.

387.   On April 3, 2002, Dr. Monsein noted that this MRI showed nothing very remarkable.  Tr. 303.   On December 2, 2002, Dr. Monsein stated that although a MRI on January 10, 2002 showed multilevel degenerative cervical DDD particularly at the C5-6 and C6-7, there nothing was indicated the MRI that would account for Jackson's new symptoms.  Tr. 309, 387.   Another cervical MRI taken on December 19, 2002, showed unremarkable findings for C2-3, C4-5 and C7-T1; a slight disc bulge at C3-4 with degenerative ridging that had been unchanged; a small to moderate broad-based central disc protrusion at C5-6 with mild spinal canal narrowing and without any neuroforaminal encroachment that was unchanged; and a moderate broad based disc bulge with probable nerve rootlet impingement and mild neuroforaminal encroachment.  Tr. 299, 385.   On July 9, 2004, Dr. Transfeldt stated that x-rays of Jackson's cervical spine showed no dynamic instability.  Tr. 331.   The MRI taken on August 19, 2004, showed no abnormalities at C2-3, C4-5 and C7-T1; moderate cervical spondylosis at C3-04, C5-6 and C6-7; C6-7 was somewhat asymmetrical extending to the left of midline causing mild narrowing in the region of the exiting nerve root sleeve of C7 on the left; no evidence of malalignment or signal abnormality of the cervical cord; and the craniocervical junction was unremarkable.  Tr. 379-380.   On October 27, 2004, Jackson underwent an EMG for the evaluation of right cervical radiculopathy by Dr. Schenck.  Tr. 399.   Dr. Schenk stated that Jackson did not appear to be in acute distress during the test; her strength, sensation and reflexes were intact; she showed no atrophy in her hands; and the nerve conduction velocity for EMG test regarding the right upper extremity was normal.  Tr. 399-400.   An MRI of Jackson's spine on November 21, 2007 showed mild central canal stenosis at C5-6; diffuse spurring and disk bulging at C6-7;

mild right foraminal stenosis at C5-6; and mild bilateral foraminal stenosis at C6-7. Tr. 464.

Treatment for Jackson's neck pain was limited to medication, home exercise program, massage, physical therapy, acupuncture, and steroid injection (Tr. 289, 303, 368, 370, 873, 875), which from time to time, she reported were helpful. Jackson told Dr. Olczak in June 2002 and Dr. Monsein in July 2002 that the acupuncture had helped her neck pain and had loosened up her neck. Tr. 305, 368. In August 2002, Jackson indicated to Dr. Olczak that her neck had been feeling relatively good. Tr. 367. On November 21, 2002, Jackson told Dr. Sabers that the facet join injections at the cervical level had improved her symptoms. Tr. 876. On September 26, 2003, she reported to Tracy that physical therapy had helped her a lot in the past. Tr. 315. On August 2 and November 1, 2005, Jackson saw Dr. Hunt for follow-ups for the surgery to her right shoulder and reported no other musculoskeletal complaints or other symptoms. Tr. 412, 413. On November 15, 2007, she reported to Dr. Maurer that she experienced pain aggravated by bending, crouching, housework, stress, tension and twisting, which were improved with heat, changing positions, medication and rest. Tr. 463.

None of Jackson's providers – Drs. Monsein, Olczak, Transfeldt, and Banks – recommended surgery for her neck.

Regarding Jackson's shoulder, despite a normal x-ray, (Tr. 378), and normal a MRI, (Tr. 389), after several years of complaints regarding her right shoulder, on March 23, 2005, Dr. Hunt performed surgery, and by May 2005, she reported her shoulder pain was gone. Tr. 407-409, 411. On August 2, 2005, Jackson met with Dr. Hunt at which time she indicated she was still having problems with her shoulder, but Dr. Hunt

noted that Jackson stopped her formal therapy and never continued the strengthening exercises. Tr. 412. On November 11, 2005, Jackson saw Dr. Hunt again and told him that she had undergone physical therapy and her shoulder pain had improved significantly. Id. Dr. Hunt was pleased with how Jackson was doing and told her to continue to increase her activity as tolerated. Id. In May 2009, Jackson reported that the shoulder surgery had been "very helpful." Tr. 675.

In summary, as the ALJ found, the medical records from Jackson's own treating physicians disclosed fairly minimal objective findings and conservative treatment as to Jackson's abdomen, bowel and neck, and to her right shoulder, following surgery, which did not support Jackson's claims of debilitating pain.

Second, to the extent that Jackson's treating physicians (Drs. Monsein, Dr. Olczak, Presthus, Transfeldt and Maurer) opined that she could not work, such conclusory opinions invade the province of the ALJ and were properly rejected by the ALJ. See Vossen, 612 F.3d at 1015; Davidson, 578 F.3d at 842. Additionally, these opinions were contradicted by Dr. Monsein's statement in April 2004 that Jackson could perform sedentary work and that he supported her resuming some type of gainful employment, (Tr. 319), and Jackson's own statement to Dr. Jetzer in September 2007, that she could work although she was concerned about the hours. Tr. 556, 563.

Third, as for the limitations Jackson's treating physicians (Drs. Olczak and Maurer) placed on Jackson's ability to sit or stand due to chronic neck and pelvic pain, (Tr. 467, 879), these opinions were belied by the medical record as a whole and Jackson's own testimony that she had no problem standing or walking. Tr. 47.

Finally, the ALJ's determination that Jackson was not precluded from engaging in gainful employment was supported by the May 2000 evaluation by Olson, (Tr. 531-39); the March 2007 physical work performance evaluation performed by Ergo Science, (Tr. 881-91); the September 2007 examination by Dr. Jetzer, (Tr. 554-64); and the state agency consultant evaluation of the records by Dr. Chisholm dated October 8, 2007. Tr. 445-53.

On November 2, 2000, Jackson had a functional examination and assessment performed by physical therapist Olson of the Institute for Occupational Rehabilitation. Tr. 551. Olson concluded that Jackson could ultimately return to work a maximum of 5 hours per work day with the ability to sit for 4-5 hours, stand 3-4 hours and walk occasional short distances over a period of 2-3 hours. Tr. 538.

Following extensive testing of Jackson's capabilities, the FCE completed by Ergo Science in March 2007 indicated that she could occasionally lift up to 10 pounds, carry up to 12 pounds, push 19 pounds, and pull 16 pounds; sit and stand frequently; work with her arms overhead or bend over occasionally; frequently kneel, climb stairs, squat, walk, crawl and climb a ladder; frequently reach at waist level and below waist level; constantly handle objects; and perform constant fingering. Tr. 884-85.

Based on that FCE, his review of her medical records and his own observations and examination of Jackson, Dr. Jetzer opined in September 2007 that following graduation of hours over two weeks, Jackson could return to work and perform fulltime employment at least sedentary work and possibly work at a light capacity. Tr. 561-563. Dr. Jetzer also opined that Jackson should have been able to return to work sometime

between 2000 and 2005, and at the latest, after her shoulder surgery in 2005. Tr. 562, 564.

Based upon his review of the medical records, Dr. Chisholm found that Jackson could occasionally lift 50 pounds, frequently carry 25 pounds; stand or walk for 6 hours in an 8 hour work day; sit for 6 hours in an 8 hour work day; and was limited in the push and pull with her upper extremities. Tr. 449. In support of his evaluation, Dr. Chisholm noted that there were no neurological or radicular signs; and there were multiple MRIs indicating minimal change in her shoulder, a negative L-spine, degenerative changes in the cervical spine, and a negative study of the hip. Tr. 450. Dr. Chisholm found Jackson's symptoms were disproportionate to the clinical findings. Tr. 453. Dr. Chisholm's findings and recommendation were upheld on reconsideration by state agency consultant physician Dr. Sandra. Tr. 469-71.

At the end of the day, it is the "province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals." Lundgren v. Astrue, Civ. No. 09-3395 (RHK/LIB), 2011 WL 882084 at *12 (D. Minn., Feb. 7, 2011) (Report and Recommendation adopted by Lundgren v. Astrue, 2011 WL 883094 at *1 (D. Minn., March 11, 2011) (citing Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")). While as a general rule medical opinions of treating physicians are given controlling weight, when a treating physician's opinions are not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when those opinions are more consistent with the record as a whole. Casey, 503 F.3d at 694. Here, the ALJ considered all of the medical opinions in the record, resolved the

conflicts among these opinions, and gave good reasons for rejecting those opinions that were inconsistent with the record as a whole, including Jackson's testimony. The Court finds no error in the ALJ's weighing of the various medical opinions in the record.[15]

## C. Medical Records Submitted to the Court

A court may remand a social security claim for consideration of subsequently located evidence "only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (quoting 42 U.S.C. § 405(g)). Evidence is "new" only if it was "not in existence or available to the claimant at the time of the administrative proceeding." Ferguson v. Commissioner of Social Sec., 628 F.3d 269, 276 (6th Cir. 2010) (internal citation and quotation omitted). "Material" evidence is evidence which is "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Secretary's determination." Woolf

---

[15] As for Jackson's suggestion that the ALJ should have given substantial weight to the continuation of long-term disability benefits by her insurance company, (see Pl.'s Mem., p. 2; Tr. 10; Pl.'s Aff., Ex. B), Social Security regulations provide in relevant part:

> A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us.

20 C.F.R § 404.1504. Given that the decision of a private insurance company is not binding on the Commissioner, the Court finds that the Commissioner did not error in not giving no weight to an email from an unknown person regarding approval of long-term disability benefits any weight.

v. Shalala, 3 F.3d 1210, 1215 (8th Cir.1993). "Good cause does not exist when the claimant had the opportunity to obtain the new evidence before the administrative record closed but failed to do so without providing a sufficient explanation." Hepp, 511 F.3d at 808 (citing Hinchey v. Shalala, 29 F.3d 428, 433 (8th Cir.1994)); see also Ferguson, 628 F.3d at 276 ("A claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. . . .") (internal citation and quotation omitted); Lisa v. Secretary of Health and Hum. Servs., 940 F.2d 40, 45 (2nd Cir. 1991) (to show "good cause" requires that the plaintiff "go beyond showing that the proffered evidence did not exist during the pendency of the administrative proceeding [,and must also] establish good cause for failing to produce and present the evidence at that time.").

### 1. Dr. Monsein's June 24, 2003 Functional Capabilities Check List

On June 24, 2003, Dr. Monsein and physical therapist Tracy filled out a functional capacities check list form related to Jackson's insurance. See Pl.'s Aff., Ex. C. The checklist provided that Jackson could frequently sit (1/3 to 2/3 of the time); occasionally (up to 1/3 of the time) stand, walk, squat, bend, knee, climb, drive, push, pull, reach, grasp and engage in repetitive motions (with writs, elbow, shoulder or ankle); and only occasionally lift less than 10 pounds. Id. The objective medical findings for these restrictions were based upon the cervical MRI taken on December 19, 2002, a 1998 lumbar MRI, and a Mayo Clinic report dated March 17, 2003. Id.

As a preliminary matter, the Court finds that there is no good cause for submission of this record at this time to the Court because Jackson provided no explanation as to why the checklist had not been previously submitted to the ALJ or the

68

Appeals Council for their consideration.  But more significantly, the Court finds this checklist is not material.  That is, it is neither non-cumulative nor is there a reasonable likelihood that it would have changed the ALJ's or Appeals Council's determination because neither the December 2002 cervical MRI or the Mayo Clinic reports support the restrictions set out in the checklist.

On December 19, 2002, Jackson underwent a cervical MRI which showed unremarkable findings for C2-3, C4-5 and C7-T1; a slight disc bulge at C3-4 with degenerative ridging that had been unchanged; a small to moderate broad-based central disc protrusion at C5-6 with mild spinal canal narrowing and without any neuroforaminal encroachment that was unchanged; and a moderate broad based disc bulge with probable nerve rootlet impingement and mild neuroforaminal encroachment. Tr. 299, 385.  While Dr. Monsein and Tracy stated that the limitations they had placed on Jackson were based, in part, on the findings of this MRI, on January 30, 2003, Dr. Monsein noted that recent MRIs showed that her left hip, pelvis and abdomen were normal, save for benign cysts.  Tr. 311.  In addition, Dr. Monsein stated that the films of her cervical spine showed loss of cervical lordosis, lumbar films were normal, shoulder films were normal, and colonoscopy with only a small polyp.  Id.  Further, Dr. Monsein stated that he did not know what was going on with Jackson and while there may be a physical cause, Dr. Monsein believed there was a mental component.  Tr. 312.  In addition, Dr. Monsein noted that all of the tests performed on her had been unremarkable and it was his opinion that they were not going to find a specific diagnosis for her.  Id.  The December 2002 MRI provides no support by the restrictions placed on Jackson by Dr. Monsein and Tracy.

The 1998 lumbar MRI referenced by Dr. Monsein and Tracy is not in the record. However, in addition to Dr. Monsein noting on January 30, 2003 that Jackson's lumbar films were normal, (Tr. 311), an October 24, 2003, MRI of Jackson's lumbar spine was also normal. Tr. 383. Whatever the MRI from 1998 revealed, by 2003, the problems apparently had been resolved.

Finally, the Mayo Clinic report dated March 17, 2003 merely showed that Jackson was suffering from constipation and simple cysts on her liver and kidneys. Tr. 778-786. There is nothing substantial in this report that provided that her ability to function was limited due to her bowel issues or cysts. Indeed, as it relates to her constipation and irritable bowel problem, her treatment was mostly conservative— mainly using laxatives and fiber for her constipation and occasionally trying medications to alleviate her irritable bowel. Tr. 372-73, 378. Moreover, as discussed previously, the balance of the objective medical findings in the record did not indicate the type of bowel problems that would have been debilitating in nature. A 2001 barium enema produced normal results. Tr. 294. On August 15, 2002, Jackson saw Dr. Olczak for pain in the lower back and hip area that Jackson believed was due to her bowels, but Dr. Olczak could not find any bowel obstruction or mass lesion and did not believe any surgery was warranted. Tr. 367. On September 27, 2002, Jackson complained of bowel pain, but Dr. Basman found it was due to hemorrhoids and doubted it was due to any organic gastrointestinal problem. Tr. 296. An October 7, 2002, flexible sigmoidoscopy was normal, except for one hyperplastic polyp. Tr. 292-94. On December 27, 2002, Jackson underwent a CT scan of her abdomen and pelvis areas, which was negative, save for some small lesions in the kidneys and liver that were most likely simple cysts.

Tr. 298, 384.  On January 30, 2003, Dr. Monsein noted that recent MRIs showed that her left hip, pelvis and abdomen were normal, save for benign cysts and she had a colonoscopy performed that only showed a small polyp.  Tr. 311.

Given that the checklist prepared by Dr. Monsein and Tracy is conclusory and the supporting evidence relied upon for the debilitating nature of Jackson's impairments is contradicted by Dr. Monsein's own medical notes and the substantial evidence in the record, the Court concludes there no reasonable likelihood that the ALJ's decision would have changed if this additional evidence, had been considered by the ALJ.

### 2.    Dr. Olczak's May 11, 2004 Letter

In a May 11, 2004 letter to Cigna, Dr. Olczak opined that Jackson is basically incapacitated by chronic neck and arm pain.  See Pl.'s Aff., Ex. D.  Dr. Olczak cited to a variety of unnamed MRIs that showed some unidentified deficits, none of which she claimed were correctable by surgery.  Id.  Dr. Olczak noted that Jackson had gone through various forms of treatment, including acupuncture, physical therapy and pain clinics and takes pain medication.  Id.  Dr. Olczak also cited to pelvic floor problems and issues with constipation.  Id.  In short, Jackson was in such pain that she could not physically do anything, and that if she sat, stood or walked for too long her pain would be aggravated.  Id.

Again, Jackson provided no explanation as to why this record had not been previously presented to the ALJ or the Appeals Council for their consideration and thus, this Court finds no good cause for its submission now.  But even if there was good cause for its late submission to this Court, this letter is not material as it is neither non-

cumulative nor is there a reasonable likelihood that it would have changed the decisions of the ALJ or the Appeals Council.

For starters, Dr. Olczak's opinion that Jackson could not basically do anything is consistent with Dr. Olczak's letter dated June 18, 2007, which the ALJ considered and gave good reasons for rejecting. Additionally, the thrust of Dr. Olczak's opinion in May 2004 that Jackson was incapacitated appears to be largely supported by Jackson's subjective complaints, as opposed to objective findings available at the time.[16] But an opinion "largely based on [claimaint's] subjective complaints" and not on objective findings, is not afforded substantial weight. See Renstrom v. Astrue, 680 F.3d 1057, 1064-65 (8th Cir. 2012) (concluding that not affording a treating physician's opinion substantial weight is appropriate where the "opinion was largely based on [claimaint's] subjective complaints.") (citing Teague v. Astrue, 638 F.3d 611, 616 (8th Cir. 2011) (concluding the ALJ properly discounted a doctor's report, in part, because it "cited only limitations based on [the claimant's] subjective complaints, not his own objective findings").

Further, as previously discussed, while there was plenty evidence in the records that Jackson was in pain, the objective findings from the MRIs, CT scans, x-rays and other objective tests did not support Dr. Olczak's opinion of debilitating pain. See Hogan, 239 F.3d at 961 ("The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.") (citation omitted).

---

[16] Indeed, the ALJ reduced Jackson's RFC due to her subjective complaints of pain (Tr. 26).

Finally, Jackson's own testimony that she had no problem walking or standing, that she could lift up to 15 pounds, and her statement to Dr. Jetzer that she felt like she could work in her previous job, contradicts Dr. Olczak's opinions that she was unable to engage in any sustained activity. Tr. 41, 307, 563. Thus, the Court finds that Dr. Olczak's May 2004 opinion to Cigna would not have likely changed the Commissioner's decision had it been available at the time of the decision.

### D. Jackson's RFC[17]

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Id. at 1218 (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)); see also Vossen, 612 F.3d at 1016 ("the burden of persuasion to prove disability and demonstrate RFC remains on the claimant."). On the other hand, the determination "that a claimant is 'disabled' or 'unable to work' concern issues reserved to the Commissioner. See Vossen, 612 F.3d at 1015.

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations. See Pearsall, 274 F.3d at 1217.

---

[17] The Court notes it is not clear whether Jackson was challenging the RFC determination by the ALJ. Nevertheless, in abundance of caution, the Court will address whether the RFC assigned to Jackson is supported by substantial evidence in the record.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." <u>Roberts v. Apfel</u>, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'" <u>Baldwin v. Barnhart</u>, 349 F.3d 549, 556 (8th Cir. 2003) (quoting <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)).[18]

As stated previously, the RFC assigned to Jackson by the ALJ was as follows: "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except lifting no more than 10-15 pounds and moving around better than stationary with no restrictions on walking or standing." Tr. 26.

Under the regulations, "light work" is defined as:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 CFR 404.1567(b).

During the hearing, the ALJ asked Jackson if she had "[a]ny difficulty with standing and walking," to which Jackson responded, "No." Tr. 47. Consistent with this testimony, the objective medical records showed that Jackson's strength, gait,

---

[18] The Court notes that the ALJ considered Jackson's subjective complaints of pain under <u>Polaski</u>. Tr. 22-26. The ALJ gave weight to these complaints of pain by decreasing a finding that she could perform moderate work in the national economy to light work, but ultimately did not conclude that her complaints of pain warranted a disability finding. Jackson did not challenge the weight the ALJ gave to her subjective complaints of pain, and thus, they are waived. <u>See</u> <u>Craig v. Apfel</u>, 212 F.3d 433, 437 (8th Cir. 2000); <u>see</u> <u>also</u> <u>Yeazel v. Apfel</u>, 148 F.3d 910, 911-12 (8th Cir.1998) (citing <u>Roth v. G.D. Searle & Co.</u>, 27 F.3d 1303, 1307 (8th Cir. 1994)) (finding failure to raise an issue before this Court results in waiver of that argument).

coordination, reflexes and sensation were for the most part normal in her lower extremities.  Tr. 289, 305 311, 373, 397, 789-90.  Further, the November 2000 functional capacity analysis by the Institute for Occupational Rehabilitation determined that Jackson had the ability to stand three to four hours a day and walk two to three hours a day.  Tr. 565.  Moreover, the FCE completed by Ergo Science showed that Jackson could frequently sit, stand and walk, and Dr. Chisholm found that she sit, stand or walk for 6 hours in an 8 hour work day.  Tr. 449, 884-85.

Based on Jackson's hearing testimony and other objective medical evidence in the record, the Court concludes that the RFC assigned by the ALJ, which included no restrictions on walking or standing, is based on the substantial evidence in the record.  See Grimm v. Astrue, No. 10–4859 (PAM/TNL), 2012 WL 523615 at *16 (D. Minn. Feb. 01, 2012) ("the ALJ's conclusion is supported by substantial evidence in the record as a whole . . . not the least of which is Plaintiff's testimony at the administrative hearing. . . .").

With regard to Jackson's ability to lift no more than 10-15 pounds, when asked by the ALJ if she had ever been told by her doctors that she had any limitations as to how much she could lift or carry, she stated that she had a lifting maximum placed at 15 pounds.  Tr. 47.  This falls within the 10-15 pound range imposed by the ALJ.  Jackson pointed to fact that her job description, provided that she would have to carry up to 20 pounds.  See Pl.'s Aff., Ex. B.  However, Jackson also testified that her job, as performed, did not even require any lifting.  Tr. 47.  Moreover, Jackson ignored the VE's opinion that the RFC allowed her to work in other positions, such as a file clerk,

check/cashier and general clerk, where the focus was an employee's time on their feet, as opposed to the ability to lift or carry. Tr. 49-50.

Other evidence supporting the RFC imposed by the ALJ included the 2000 rehabilitation assessment, which provided that Jackson could use a keyboard for at least 20 minutes at a time, (Tr. 553), despite her low tolerance with her right hand. By June 2002, she denied sensitivity or pain in her hands, (Tr. 369), and in numerous examinations over time, showed she had a good grip in her hands, and a good range of motion in her wrists and elbows. Tr. 369, 727, 884-86, 890-91. On July 9, 2004, Dr. Transfeldt found no clear cut motor or sensory defects involving Jackson's upper extremities, the EMG testing on October 27, 2004 of Jackson's right extremity was normal, and the 2005 shoulder surgery improved her right shoulder pain significantly. Tr. 331, 399, 413. The FCE performed in March 2007, indicated that Jackson could frequently sit, stand, walk, reach at waist level, reach below waist level, constantly handle objects, perform constant fingering and had normal hand strength. Tr. 884-86. In September 2007, Dr. Jetzer stated that Jackson's neck, shoulders, hand grip and back were primarily normal upon examination. Tr. 560, 563.

This Court finds that the RFC assigned to Jackson and the determination that Jackson capable of performing work in the national economy to be based on substantial evidence in the record.

### E. <u>Conclusion</u>

The Court concludes that substantial evidence in the record supports the ALJ's weighing of the medical opinions and ultimately, his RFC determination. Further, the VE's testimony, based on that RFC, that Jackson can perform her past employment and

other employment in the national economy, constitutes substantial evidence to support the ALJ's determination that Jackson is not disabled within the meaning of the Social Security Act.

**VI.    RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 8] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 15] be **GRANTED**.

Dated:        February 11, 2013

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 25, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.